JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Brett and Dana Weinstein, as Husband and Wife

**DEFENDANTS**
JP Morgan Chase/Chase Financial (See attached)

(b) County of Residence of First Listed Plaintiff Montgomery, PA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant New York
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
David T. Shulick, Esquire

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☒ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. 1681

Brief description of cause:
Fair Credit Reporting act and Consumer Fraud Act violations

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 DEMAND $ 1,500,000.00
CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE C. DARNELL JONES, II DOCKET NUMBER 11-1836

DATE 1/24/12 SIGNATURE OF ATTORNEY OF RECORD [signature]

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

BRETT WEINSTEIN + DANA WEINSTEIN, AS H/W : CIVIL ACTION
v. :
JP MORGAN CHASE / CHASE FINANCIAL : NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks. (X)

| 1/24/12 | DAVID T. SHULICK | PLAINTIFFS |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215)988-5488 | (215)988-5478 | david@shulicklaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRETT and DANA WEINSTEIN, As Husband and Wife**<br>2623 Condor Circle<br>Norristown, PA 19403 | : | **CIVIL ACTION COMPLAINT** |
| v. | : | |
| **JP MORGAN CHASE/CHASE FINANCIAL**<br>270 Park Avenue<br>New York, NY 10017-2070 | : | **NO:** |
| and | : | **JURY TRIAL DEMANDED** |
| **ROBERT TATE**<br>115 Pheasant Run, Suite 110<br>Newtown, PA 18940 | : | |
| and | : | |
| **GRANITE LOAN MANAGEMENT LLC**<br>10770 E. Briarwood Avenue, Suite 280<br>Centennial, CO 80112 | : | |
| and | : | |
| **WILMINGTON TRUST, N.A.**<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, DE 19890 | : | |
| and | : | |
| **EQUIFAX CREDIT INFORMATION SERVICES, INC.**<br>1550 Peachtree Street, NW<br>Atlanta, GA 30309 | : | |
| and | : | |
| **EXPERIAN**<br>475 Anton Boulevard<br>Costa Mesa, CA 92626 | : | |
| and | : | |
| **TRANSUNION**<br>2 Baldwin Place<br>Chester, PA 19022 | : | |
| And | : | |
| **JOHN DOE, INDIVIDUAL AND/OR ENTITY** | : | |

## CIVIL ACTION COMPLAINT

Plaintiffs, Brett and Dana Weinstein, husband and wife, by and through their undersigned counsel, David T. Shulick, Esquire, herein file a Civil Action Complaint, and in support thereof, aver as follows:

1.      Plaintiffs, Brett and Dana Weinstein (hereinafter "Weinstein"), are residents of the Commonwealth of Pennsylvania, with a residence is located at 2623 Condor Circle, Norristown, Pennsylvania.

2.      Defendant, JP Morgan Chase/Chase Financial, is, upon information and belief, a Delaware Corporation with headquarters in New York, with a principal place of business located at 270 Park Avenue, New York, New York.   On or about March 14, 2011, Plaintiff filed a Civil Action Complaint in the Eastern District of Pennsylvania against JP Morgan Chase/Chase Financial, at Docket Number 11-1836.   A true and correct copy of the pleadings in the Weinstein, et al. v. JP Morgan Chase/Chase Financial are incorporated herein and attached hereto as **Exhibit "A."** The instant action is based on additional facts due to recently-discovered evidence.

3.      Defendant, Robert Tate, is, upon information and belief, an adult individual who is an authorized agent and/or representative of Defendant JP Morgan Chase/Chase Financial, with a principal place of business located at 115 Pheasant Run, Suite 110, Newtown, Pennsylvania.

4.      Defendant, Granite Loan Management, LLC (hereinafter "GLM") is, upon information and belief, a Delaware Corporation with headquarters in Colorado, with a principal place of business located at 10770 E. Briarwood Avenue, Suite 280, Centennial, Colorado.

5.      Defendant, Wilmington Trust, N.A., is, upon information and belief, a Delaware Corporation with a principal place of business located at Rodney Square North, 1100 North Market Street, Wilmington, Delaware.

6.      Defendant, Equifax, is, upon information and belief, a Delaware Corporation with a principal place of business located at 1550 Peachtree Street NW, Atlanta, Georgia, which is a

consumer reporting agency as defined under the Fair Credit Reporting Act (hereinafter "FCRA"), 15 U.S.C. §1681a(f), that has maintained a file on Plaintiffs.

7. Defendant, Experian, is, upon information and belief, a Delaware Corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California, which is a consumer reporting agency as defined under the FCRA, that has maintained a file on Plaintiffs.

8. Defendant, Trans Union, is, upon information and belief, a Delaware Corporation with a principal place of business located at 2 Baldwin Place, Chester, Pennsylvania, which is a consumer reporting agency as defined under the FCRA, that has maintained a file on Plaintiffs.

9. Defendant, John Doe, individual and/or entity, is unknown at the time of the filing of this suit, but was directly involved in the direction, custody, and/or control of the operations of all aforementioned Defendants, and is liable as such for the reasons stated herein.

**JURISDICTION/VENUE**

10. Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1331, Federal Questions Jurisdiction, in that Plaintiffs are suing Defendants, jointly and severally under the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., for falsely and fraudulently reporting their credit information.

11. Jurisdiction is vested in this court for all claims other than the Fair Credit Reporting Act pursuant to 28 U.S.C. § 1367, Supplemental Jurisdiction, in that all of the claims are so related that they are part of the same case or controversy.

12. Venue for this action is properly laid in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(a)(2) in that all or a substantial part of the events giving rise to this claim (the "contractual dealings") occurred in that district.

13.   The amount in controversy is significantly in excess of $125,000.00.

## FACTUAL BACKGROUND

14.   Plaintiffs initially commenced a Civil Action (hereinafter "Plaintiffs' Initial Action") in the Eastern District of Pennsylvania against Defendant JP Morgan Chase/Chase Financial, at Docket Number 11-1836. Plaintiff seeks to consolidate the instant action with the Initial Action by way of contemporaneous filing of a Motion for Consolidation with this Court.

### Plaintiffs' Purchase of Real Estate is Financed by Defendant Chase

15.   On or around December 2007, Plaintiffs, Brett and Dana Weinstein, acquired Lot 8 of the community known as "Highgrove" in Tredyffrin Township, Chester County, Pennsylvania, with the intention of building their dream home.

16.   Plaintiffs, upon initial inspection of the property, were informed that all of the properties in the Highgrove community were to be built by Masterpiece Homes, and that Defendant Michael H. Visich Architects would serve as the architectural firm for the design of all homes within the Highgrove community.

17.   Plaintiffs paid a sum of $930,000.00 for Lot 8 at Highgrove.

18.   The Real Estate closing for Lot 8 at Highgrove occurred on or about December 14, 2007, at which point, Plaintiffs Weinstein paid a total of $223,595.00 in cash to the Title Company, Grateful Abstract. A true and correct copy of the HUD Settlement Statement for the property closing is attached hereto and incorporated herein as **Exhibit "B."**

19.   In order to fully finance the construction of their dream home, Plaintiffs Weinstein obtained a Construction Loan from Defendant Chase. A true and correct copy of the Construction Loan Agreement is attached hereto and incorporated herein as **Exhibit "C."**

20. Plaintiffs Weinstein originally financed the $930,000.00 lot purchase through Defendant Chase, which was then paid off through the Construction Loan. It is the Construction Loan which is the subject of this litigation.

21. Defendant Robert Tate was Defendant Chase's authorized agent that manifested both of these settlements and all of the transactions by and between Plaintiffs and Defendant Chase. Defendant Tate, upon information and belief, had previously been a loan officer of Wells Fargo, but began working for Defendant Chase before the time of Plaintiffs transactions with Defendant Chase. Upon information and belief, Defendant Tate is currently again employed by Wells Fargo.

**Plaintiffs' Builder is Approved by Defendant Chase**

22. Plaintiffs engaged Stephen Mumper, owner of Masterpeice Homes of Villanova Pennsylvania, to construct their home.

23. Significantly, as part of the transaction by and between Plaintiffs and Defendant Chase, Plaintiffs Weinstein paid Defendant Chase for a diligent search of Mumper/Masterpiece Homes before Masterpiece was approved by Defendant Chase. Defendant Chase specifically and affirmatively approved Mumper/Masterpiece Homes as a qualified builder with qualified assets, experience and other related credentials.

24. Following the approval of Mumper/Masterpiece Homes by Defendant Chase, Plaintiffs Weinstein entered into a Construction Agreement with Mumper of Masterpiece Homes of Villanova, Pennsylvania to construct a residence thereon for an additional sum of approximately $1,500,000.00.

25.     After Plaintiffs Weinstein entered the Construction Agreement with Masterpiece Homes, Plaintiffs paid a total of $117,500.00 directly to Mumper/Masterpiece Homes between March 2008 and September 2008.

26.     On or about September 29, 2008, Plaintiffs Weinstein made settlement on the Construction Loan to be financed by Defendant Chase.   At this settlement, Plaintiffs paid $372,236.65.   A true and correct copy of the HUD Settlement Statement for the Chase Construction Loan closing and checks made payable to Grateful Abstract are attached hereto and incorporated herein as **Exhibit "D."**

27.     The Construction Loan Agreement had several specific clauses in it, including the following:

   a.     Definition 1.2, "General Contractor" means MASTERPIECE HOMES.

   b.     Paragraph 5.2 reads "Draw Requests" – Borrower shall have submitted and Lender shall have approved a Draw Request and a form required by Lender ("Draw Request"), signed by both Borrower and General Contractor for each disbursement requested.  The Draw Request shall be submitted to Lender at least seven (7) days prior to the requested disbursement.  No more than one (1) Draw Request shall be submitted during any calendar month.  If Borrower executes a "Delegation of Authority", or its equivalent, whereby Borrower delegates to the General Contractor authority to be sole signatory to Draw Requests, such delegation of authority is hereby incorporated into this Loan Agreement.

   c.     Paragraph 5.3 reads "Notice from Inspector" – Lender shall have received notice from the Inspector hired for the sole purpose of protecting Lender's collateral, and to provide information to Lender regarding the percentage completion of the improvements.

   d.     Paragraph 5.7 reads "Construction" – "the improvements are being constructed timely and erected entirely…in strict compliance with all applicable laws, ordinance, plaques, restrictions…in a good and workmanlike manner free from mechanic's liens…with materials and workmanship of the highest quality…in strict accordance with the plans…"

   e.     Paragraph 5.10 reads "Amount of Disbursements – the aggregate amount of all previous disbursements under this loan agreement, plus the amount being currently requested does not exceed the lesser of (a) the value of labor and materials expended for

and physically incorporated into the improvements through the date of the then-currently requested disbursement as approved by the Lender or the amount allocated by the Lender to the stage of completion for the improvements as of the date of the then-currently requested disbursement.

f. Paragraph 5.11 reads "Liminal disbursement – The then-currently requested disbursement shall not reduce the construction fund to an amount below the amount needed to pay for the labor and materials that, in Lenders sole and absolute and arbitrary judgment, it is necessary to complete the improvements according to the plans. Disbursements to fund overhead line items shall be made proportionate to the percentage to which the improvements have been completed in accordance with the budget as conclusively determined by Lender in its sole absolute and arbitrary discretion…"

g. Paragraph 6.2, entitled "Disbursement Against Promissory Note of Construction Fund Rates – Each disbursement shall be made against the Note and the Construction Fund by increasing the amount of the outstanding principal under the Note to the extent loan proceeds are used. The available amount remaining for disbursement of the Construction Fund will be reduced by any amount of any disbursement against the Construction Fund…"

h. Paragraph 7, entitled "Effective Signing Draw Requests – By executing a Draw Request, Borrower is:

> (i) representing that Borrower has inspected the improvements and certifies that the improvements are consistent with the plans;
>
> (ii) representing that the improvements are satisfactory in all respects to the Borrower;
>
> (iii) representing to Lender that the percentage completion of the improvements is equal to, or greater than, the percentage of the Construction Fund that has been disbursed; and
>
> (iv) releases Lender from any and all claims …that are attributable to acts or omissions occurring before the date the Borrower executes the Draw Request and holds Lender harmless for any of Lender's agent's activities…

i. Paragraph 11.3 entitled "Inspection - Lender, and its agents… shall have the right but not the obligation, to enter upon the real property without notice to inspect the improvements…"

j. Paragraph 12, entitled "Events of Default", has a series of default provisions, starting at Paragraph 12.1 and ending at Paragraph 12.17. Specifically, Paragraph 12.14 and 12.15 relate to abandonment of the construction for up to sixty (60) days or timely completion of construction.

k. Paragraph 15.15 of the Loan Agreement, entitled "Controlling Law" reads "This Loan Agreement is entered into in the State and shall be controlled and interpreted

by the laws of the State except to the extent preempted by Federal Law. Further, Paragraph 1 of the Loan Agreement defines State as "Pennsylvania".

l. Paragraph 15.18, entitled "Enforceability Rights", reads "The language of all provisions of this Loan Agreement shall be construed according to its fair meaning and strictly against any party… [as Agreement was written as a form agreement by Defendant J.P. Morgan Chase]".

*See* **Exhibit "D."**

28. In or around October 2008, another prospective homeowner in "Highgrove", Scott Irvine, had entered into an agreement for what is believed to be Lot 12 in the "Highgrove" Development, along with a Construction Agreement with Mumper of Masterpiece Homes of Villanova, PA. Irvine also entered into a Construction Loan Agreement with Defendant Chase for a home to be built that would cost approximately $2,500,000.00. However, Irvine, unlike Weinstein, paid an additional $750,000.00 +/- directly to Masterpiece Homes, while Weinstein utilized the construction financing.[1] True and correct copies of the Irvine Agreements will be produced during discovery of this matter.

**Defendants Tate, Wilmington Trust, and/or Chase Engage in Deceptive and Negligent Practices**

29. As a result of Defendant Chase's improper and illegal conduct, as further set forth herein, Mumper/Masterpiece Homes obtained improper payments by Defendant Chase, charged against Plaintiffs' Construction Loan, as follows:

a. September 16, 2008 - $130,000.00

b. January 28, 2009 - $166,032.23

A true and correct copy of the Draw Requests are attached hereto and incorporated herein as **Exhibit "E."**

[1] Irvine had identical transactions as Weinsteins: his original lot financing was through Chase, and then rolled into Chase, as was the Weinsteins and he used Mumper/Masterpiece for the construction of his home.

30.     The September 16, 2008 draw was allegedly for purposes, including, but not limited to Mumper/Masterpiece completing the foundation for Plaintiffs' home and Mumper/Masterpiece forwarding payment to the architectural firm retained to design the construction project.

31.     Although the initial draw on Plaintiffs' Construction Loan made by Mumper/Masterpiece Homes was to be used for paying the architectural firm, in or around February 2009, the architect on the project issued an invoice to Plaintiffs Weinstein for approximately $30,000.00, indicating that Masterpiece had never issued payment.

32.     Notwithstanding the fact that the work for which Mumper/Masterpiece allegedly was to use the September 16, 2008 draw had not been completed, a second draw was issued from Defendant Chase to Mumper/Masterpiece on January 28, 2009.  This draw was allegedly to be for additional site work to be performed on the property, which was not completed.

33.     On or about February 2009, just two (2) weeks after Mumper/Masterpiece received its second draw from Plaintiffs' Construction Loan, Mumper/Masterpiece closed its doors without any notice or warning to Plaintiffs and subsequently filed for bankruptcy.

34.     Upon information and belief, Defendant Wilmington Trust was the bank of Mumper/Masterpiece.

35.     Upon information and belief, when Mumper/Masterpiece were issued the second draw from Plaintiffs' Construction Loan in January 2009, Mumper deposited these funds into his account with Defendant Wilmington Trust.

36.     Upon information and belief, after Mumper/Masterpiece went out of business, Defendant Wilmington Trust seized Mumper's account and used the funds which were illegally and improperly drawn from Plaintiffs' construction loan to pay Mumper/Masterpiece's other

outstanding obligations, and Defendants and Wilmington Trust did not apply these funds against the balance of monies owed with regard to Plaintiffs' property.

37.     Due to the closing of Masterpiece Homes by Mumper, Plaintiffs Weinstein have been forced to redesign their home with a new architect.  This cost Plaintiffs an additional $15,000.00.

38.     Additionally, the new plans for the home require that the foundation poured on the site be completely removed, which will cost Plaintiffs an additional $100.000.00.

39.     Significantly, Defendant Chase had notice of the Masterpiece financial problems and never disclosed those to Plaintiffs.  Attached hereto and incorporated herein as **Exhibit "F"** are copies of correspondences to and from the Architect, Michael Visich, showing how the Mumper/Masterpiece's initial payments to him 'bounced' and the checks were returned.  Exhibit "F" further proves that Masterpiece banked at Defendant Chase, and Defendant Chase had full access to Masterpiece's financials at all relevant times, and has a delinquent and/or increasing credit card balance with Defendant Chase at all relevant times.

40.     Upon information and belief, both of the aforementioned draws which Mumper/Masterpiece Homes obtained from Defendant Chase are at issue in this litigation, in that they were improper, ultra vires, and illegal.

41.     Additionally, these draws were manifested not for the benefit of the Weinsteins, but for the benefit of Defendant Chase who knew, or should have known, of the dire financial situation of Mumper/Masterpiece.

42.     Nevertheless, Defendant Chase, upon information and belief, approved these draws without corresponding construction work being manifested on Plaintiffs' property, including, without limitation, foundation, site, framing, and otherwise.

43.    At all times relevant hereto, Defendant Chase was aware of the financial situation of Mumper/Masterpiece, the bankruptcy proceedings, and the issues that they have caused in delaying – and then halting – the construction of Plaintiffs' home.

44.    Additionally, upon information and belief, Defendant Tate of Defendant Chase satisfied a $175,000 lien to the seller of Plaintiffs land, LeBoutillier Road Associates Acquisition Corporation.    Defendant Chase, by and through their agent, Defendant Tate, arranged, in conspiracy with LeBoutillier, the removal of a lien on Plaintiffs' land, ad the re-imposition of a lien on Plaintiffs land.

45.    In addition, Defendant Tate and/or Defendant Chase imposed that Plaintiffs pay a $1,405 fee to Defendant GLM, as reflected on line 806 of Plaintiffs Construction Loan Settlement Sheet, attached hereto as **Exhibit "D."**

46.    Defendant GLM touts itself as being the "industry expert in construction lending and fund control."    A true and correct copy of a printout of GLM's website, www.graniteloan.com, is attached hereto and incorporated herein as **Exhibit "G."**  Defendant GLM's website indicates the following information to consumers:

> We are a full-service Construction Risk Mitigation Company offering services such as Contractor Review and Acceptance, Project Review and Approval, Fund Control including Inspections and Reporting as well as the forwarding of billing statements and collection of payments.
>
> With both new home origination and homeowner rehabilitation on the rise, construction lending represents explosive opportunities for growth. Construction loan gross yields are in excess of typical mortgage products, but without a solid fund control process in place, the risks represented can quickly debilitate even the most secure programs.
>
> GLM, through its Risk Mitigation System, offers lenders and private individuals the ideal way to oversee the fund control process without the burden of additional paperwork and excessive

> legal consultation. With unsurpassed policies and procedures, GLM takes the guesswork out of statutory lien law throughout every phase of the construction process. Through our in-house fund control department, we offer our clients web-based budget and draw status, quality inspections from Maine to Maui and all within established service standards.

*See* **Exhibit "G."**

47. Defendant GLM fraudulently accepted the payment of fees from Plaintiff, while provided none of the construction loan management and fund control they allege to provide to consumers.

**Defendants Allege that Plaintiffs Have Defaulted on Their Loan**

48. At all times relevant hereto, Plaintiffs Weinstein have been timely making all mortgage payments to Defendant Chase in an effort to maintain their previously-outstanding personal credit with the three (3) credit reporting agencies, Defendants Equifax, Experian and Trans Union. In fact, although the Plaintiffs' monthly payment was approximately $1,500.00, Plaintiffs had consistently been paying Defendant Chase $2,000.00 per month.

49. Without any prior notice, as Plaintiffs Weinstein had timely made all monthly mortgage payments to Defendant Chase, on or about September 28, 2010, Plaintiffs received notice from a "Default Payment Specialist" of Defendant Chase that Plaintiffs' payment was being returned. A true and correct copy of this correspondence is attached hereto and incorporated herein as **Exhibit "H."**

50. On or about September 29, 2010, Plaintiffs Weinstein received notice from the law firm of Phelan, Hallinan & Schmeig, LLP, indicating the intention of Defendant Chase to foreclose on the Construction Loan. A true and correct copy of this correspondence is attached hereto and incorporated herein as **Exhibit "I."**

51. Notwithstanding the September 2010 notices, Plaintiffs Weinstein have continued to forward payments to Defendant Chase, all of which have been returned. The last check from Plaintiffs which was deposited by Defendant Chase was deposited in August 2010.

52. On or about October 5, 2009, Plaintiffs Weinstein contacted Defendant Chase requesting an extension of the of the proposed completion date to July 31, 2010, due to the fact that Masterpiece Homes was no longer in business and would not be completing the construction of their home. Thus, at this point in time, Defendant Chase had not only received actual and/or constructive notice from Mumper/Masterpiece that construction would no longer be continuing on Plaintiffs' residence, they had also received actual notice from Plaintiffs Weinstein. A true and correct copy of this correspondence is attached hereto and incorporated herein as **Exhibit "J."**

53. Additionally, on or about October 11, 2010, Plaintiffs Weinstein contacted Phelan, Hallinan & Schmeig, LLP disputing the validity of the September 29, 2010 correspondence indicating Defendant Chase's intent to foreclose on the Construction Loan. A true and correct copy of this correspondence is attached hereto and incorporated herein as **Exhibit "K."**

54. On or about October 21, 2010, Plaintiffs Weinstein received correspondence from Phelan, Hallinan & Schmeig, LLP indicating that the intent of Defendant Chase to foreclose on the Construction Loan was valid. A true and correct copy of this correspondence is attached hereto and incorporated herein as **Exhibit "L."**

55. In or about December 2010, Plaintiffs Weinstein received notification that Defendant Chase had issued negative reports to the three (3) credit reporting agencies, Defendant

Equifax, Defendant Experian and Defendant Trans Union, falsely indicating that Plaintiffs were behind on their mortgage payments.

56. On or about January 26, 2010, Plaintiffs Weinstein received a Notice of Default from Defendant Chase. A true and correct copy of this notice is attached hereto and incorporated herein as **Exhibit "M."**

57. Upon information and belief, Defendant Chase had actual and/or constructive notice of Masterpiece's financial issues as a result of being inextricably intertwined with the Irvine Funds paid to and from Masterpiece Builders, and other related matters, which Defendant Chase did not disclose to the Weinsteins.

58. As a direct and proximate result, Plaintiffs Weinstein have incurred substantial damages in excess of $800,000.00.

**COUNT I – NEGLIGENCE**
**(Plaintiffs v. Defendant GLM)**

59. Plaintiffs hereby incorporate paragraphs 1 through 58 as if the same were set forth herein at length herein.

60. Plaintiffs Weinstein secured a Construction Loan from Defendant Chase. *See* Construction Agreement, attached hereto and incorporated herein as Exhibit "B."

61. Defendant GLM was paid a fee by Plaintiffs to oversee and manage all construction funds associated with Plaintiffs' property. *See* **Exhibit "D."**

62. Under the Loan Agreement, Defendant Chase negligently misrepresented to Plaintiffs Weinstein that no funds would be advanced to Mumper/Masterpiece Homes without respective, proportionate construction being completed.

63. Defendant Chase and/or Defendant GLM failed to properly inspect and investigate Mumper/Masterpiece Homes before issuing draws to Masterpiece in the amounts of $130,000.00 and $166,032.23. *See* **Exhibit "E."**

64. This failure to properly inspect and investigate constituted a failure to exercise reasonable care in evaluating Masterpiece and a failure to exercise reasonable in approving the draws, constituting a breach of the duty owed to Plaintiffs Weinstein.

65. The misrepresentations made by Defendants Chase and/or GLM to Plaintiffs Weinstein were material to the transactions, in that Plaintiffs relied upon Defendants Chase and/or GLM to fully investigate Mumper/Masterpiece before disbursing to the builder funds for which Plaintiffs were responsible. Further, Defendants Chase and/or GLM had notice of the Masterpiece financial problems and never disclosed those to Weinstein. Attached hereto and incorporated herein as **Exhibit "F"** are copies of correspondences to and from the Architect, Michael Visich, showing how the Masterpiece initial payments to him 'bounced' and the checks were returned, and the Exhibit further proves that Masterpiece banked at Chase, and Chase had full access to Masterpiece's financials at all relevant times.

66. Upon information and belief, the draws issued to Masterpiece Homes were manifested not for the benefit of Plaintiffs Weinstein, but for the benefit of Defendants Chase and/or GLM, who knew, or should have known, of the dire financial situation of Mumper/Masterpiece, but who, upon information and belief, approved these draws without corresponding construction work being manifested on Plaintiffs' property. Further, Defendants Chase and/or GLM, upon information and belief intentionally deceived Plaintiffs to keep as much business flowing to Masterpiece/Mumper, because Masterpiece and Mumper were liable and in debt to Defendants Chase and/or GLM, so Chase had at all relevant times and inherent

and untenable conflict of interest between Plaintiffs, its own assets, and Masterpiece, Mumper's assets, which was not disclosed to Plaintiffs.

67. As a result of the improper, illegal, and ultra vires conduct of Defendant Chase and Defendant GLM in negligently misrepresenting to Plaintiffs Weinstein that the proper inspections were taking place with regard to the approval of the two (2) draws to Masterpiece Homes and subsequently, Plaintiffs Weinstein have suffered substantial economic harm in excess of $800.000.00.

**COUNT II - LENDER LIABILITY**
**<u>BREACH OF FIDUCIARY DUTY</u>**
**(Plaintiff v. Defendant GLM)**

68. Plaintiffs hereby incorporate paragraphs 1 through 67 as if the same were set forth herein at length herein.

69. A fiduciary relationship existed between Plaintiffs Weinstein and Defendant GLM.

70. A fiduciary duty is created by a lender creates where lender exercises substantial control over the borrower's business affairs. *Busy Bee, Inc. v. Wachovia Bank*, 2006 WL 723487 at *22 (Feb. 2006), citing *G.E. Capital Mortgage Services, Inc. v. Pinnacle Mortgage Investment Corp.*, 897 F.Supp. 854, 863 (E.D.Pa.1995); <u>Blue Line Coal Co., Inc. v. Equibank</u>, 683 F.Supp. 493, 496 (E.D.Pa.1988); <u>Stainton v. Tarantino</u>, 637 F.Supp. 1051, 1066 (E.D.Pa.1986).

71. In addition, Defendant Tate and/or Defendant Chase imposed that Plaintiffs pay a $1,405 fee to Defendant GLM, as reflected on line 806 of Plaintiffs Construction Loan Settlement Sheet, attached hereto as **Exhibit "D."**

72.     Defendant GLM touts itself as being the "industry expert in construction lending and fund control." *See* **Exhibit "G."**   Defendant GLM's website indicates the following information to consumers:

> We are a full-service Construction Risk Mitigation Company offering services such as Contractor Review and Acceptance, Project Review and Approval, Fund Control including Inspections and Reporting as well as the forwarding of billing statements and collection of payments.
>
> With both new home origination and homeowner rehabilitation on the rise, construction lending represents explosive opportunities for growth. Construction loan gross yields are in excess of typical mortgage products, but without a solid fund control process in place, the risks represented can quickly debilitate even the most secure programs.
>
> GLM, through its Risk Mitigation System, offers lenders and private individuals the ideal way to oversee the fund control process without the burden of additional paperwork and excessive legal consultation. With unsurpassed policies and procedures, GLM takes the guesswork out of statutory lien law throughout every phase of the construction process. Through our in-house fund control department, we offer our clients web-based budget and draw status, quality inspections from Maine to Maui and all within established service standards.

*See* **Exhibit "G."**

73.     Prior to the formation of the contract between Plaintiffs and Defendant GLM, the representations made to Plaintiffs were grossly negligent, and/or false.

74.     Defendant GLM fraudulently accepted the payment of fees from Plaintiff, while provided none of the construction loan management and fund control they allege to provide to consumers.

75.     As a result, Defendant GLM was in a fiduciary relationship with Plaintiffs Weinstein, and, accordingly, breached that duty.

76. As a result of the breach of fiduciary duty on the part of Defendant GLM, Plaintiffs Weinstein have suffered significant economic harm in excess of $800.000.00.

**COUNT III**
**VIOLATION OF THE FAIR CREDIT REPORTING ACT (15 U.S.C. § 1681, et seq.)**
**(Plaintiffs v. Defendants Equifax, Experian, and Trans Union)**

77. Plaintiffs hereby incorporate paragraphs 1 through 76 as if the same were set forth herein at length herein.

78. The Fair Credit Reporting Act (hereinafter "FCRA"), 15 U.S.C. § 1681, et seq., requires any creditor reporting to any of the credit bureaus in the United States to do so accurately.

79. Plaintiffs Weinstein are 'persons' and 'customers' as defined in the FCRA. 15 U.S.C. §1681a(b); 15 U.S.C. §1681a(c).

80. Defendant Chase is a 'furnisher of information to consumer reporting agencies' as defined in the FCRA. 15 U.S.C. §1681s-2.

81. Defendant Equifax is a 'consumer reporting agency' as defined in the FCRA. 15 U.S.C. §1681a(e).

82. Defendant Experian is a 'consumer reporting agency' as defined in the FCRA. 15 U.S.C. §1681a(e).

83. Defendant Trans Union is a 'consumer reporting agency' as defined in the FCRA. 15 U.S.C. §1681a(e)

84. On or about December 2010, Plaintiffs retrieved their credit reports, reflecting negative information from Defendant Chase which has negatively affected Plaintiffs' credit rating.

85.    Defendant Chase indicated to three (3) credit reporting agencies – Defendants Equifax, Experian and TransUnion - that Plaintiffs Weinstein were behind on their mortgage payments, when, in fact, Plaintiffs had been and continue to consistently make timely payments to Defendant Chase, which have been refused and returned to Plaintiffs.

86.    Defendant Chase had a duty to ensure, in reporting information to credit reporting agencies, that "the information is, in fact, accurate." 15 U.S.C. § 1681s-2(a)(1)(B)(ii).

87.    Pursuant to the FCRA, "[i]f any financial institution that extends credit and regularly and in the ordinary course of business furnishes information to a consumer reporting agency described in section 1681a(p) of this title furnishes negative information to such an agency regarding credit extended to a customer, the financial institution shall provide a notice of such furnishing of negative information, in writing, to the customer." 15 U.S.C. § 1681s-2(a)(7)(A)(i). Thus, Defendants had a duty to provide notice of any negative information.

88.    Defendants have violated this duty owed Plaintiffs to ensure the accuracy of negative information on consumer reports.

89.    As a result of the breach of fiduciary duty on the part of Defendants Equifax, Experian, and Trans Union. Plaintiffs Weinstein have suffered significant economic harm in excess of $800,000.00.

90.    Plaintiff is entitled to actual damages and/or statutory damages sustained, as well as reasonable attorney's fees. 15 U.S.C. § 1681o.

**COUNT IV**
**CONSUMER FRAUD AND VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, et. seq.)**
**(Plaintiffs v. Defendants GLM, Tate, and Wilmington Trust)**

91.     Plaintiffs hereby incorporate paragraphs 1 through 90 as if the same were set forth herein at length herein.

92.     Plaintiffs are "persons" as defined under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(2).

93.     Pennsylvania's Unfair Trade Practices and Consumer Protection Law defines "unfair methods of competition" and "unfair or deceptive acts or practices" as including:

> (i) Passing off goods or services as those of another;
> (ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;
> (iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;
> . . .
> (vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;
> . . .
> (xii) Promising or offering prior to time of sale to pay, credit or allow to any buyer, any compensation or reward for the procurement of a contract for purchase of goods or services with another or others, or for the referral of the name or names of another or others for the purpose of attempting to procure or procuring such a contract of purchase with such other person or persons when such payment, credit, compensation or reward is contingent upon the occurrence of an event subsequent to the time of the signing of a contract to purchase;
> . . .
> (xiv) Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;
> . . .
> (xvi) Making repairs, improvements or replacements on tangible, real or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing;
> . . .
> (xxi) Engaging in any other fraudulent or deceptive conduct which creates likelihood of confusion or of misunderstanding.

73 P.S. § 201-2(4)

94. As part of the transaction by and between Plaintiffs and Defendants, Plaintiffs Weinstein paid Defendant Chase for a diligent search of Mumper/Masterpiece Homes before Masterpiece was approved by Defendant Chase. Defendant Chase specifically and affirmatively approved Mumper/Masterpiece Homes as a qualified builder with qualified assets, experience and other related credentials.

95. Defendant Chase represented that it would provide services to Plaintiffs Weinstein related to a builder approval and Construction Loan Agreement in that it would work in good faith with Plaintiffs pursuant thereto, before Plaintiffs provided thousands upon thousands of dollars of fees to Defendant Chase for said builder approval and related Construction Loan financing and services. However, Chase, upon information and belief intentionally deceived Plaintiffs to keep as much business flowing to Mumper, because Masterpiece and Mumper were liable and in debt to Defendant Chase, so Defendant Chase had at all relevant times and inherent and untenable conflict of interest between Plaintiffs, its own assets, and Masterpiece, Mumper's assets, which was not disclosed to Plaintiffs.

96. Additionally, upon information and belief, Defendant Tate of Defendant Chase satisfied a $175,000 lien to the seller of Plaintiffs' land, LeBoutillier Road Associates Acquisition Corporation. Defendant Chase, by and through their agent, Defendant Tate, arranged, in conspiracy with LeBoutillier, the removal of a lien on Plaintiffs' land, and the re-imposition of a lien on Plaintiffs' land.

97. In addition, Defendant Tate and/or Defendant Chase imposed that Plaintiffs pay a $1,405 fee to Defendant GLM, as reflected on line 806 of Plaintiffs Construction Loan Settlement Sheet, attached hereto as **Exhibit "D."**

98.    Defendant GLM touts itself as being the "industry expert in construction lending and fund control."    A true and correct copy of a printout of GLM's website, www.graniteloan.com, is attached hereto and incorporated herein as **Exhibit "G."**  Defendant GLM's website indicates the following information to consumers:

> We are a full-service Construction Risk Mitigation Company offering services such as Contractor Review and Acceptance, Project Review and Approval, Fund Control including Inspections and Reporting as well as the forwarding of billing statements and collection of payments.
>
> With both new home origination and homeowner rehabilitation on the rise, construction lending represents explosive opportunities for growth. Construction loan gross yields are in excess of typical mortgage products, but without a solid fund control process in place, the risks represented can quickly debilitate even the most secure programs.
>
> GLM, through its Risk Mitigation System, offers lenders and private individuals the ideal way to oversee the fund control process without the burden of additional paperwork and excessive legal consultation. With unsurpassed policies and procedures, GLM takes the guesswork out of statutory lien law throughout every phase of the construction process. Through our in-house fund control department, we offer our clients web-based budget and draw status, quality inspections from Maine to Maui and all within established service standards.

*See* **Exhibit "G."**

99.    Defendant GLM fraudulently accepted the payment of fees from Plaintiff, while provided none of the construction loan management and fund control they allege to provide to consumers.

100.    Upon information and belief, Defendant Wilmington Trust was the bank of Mumper.  When Mumper/Masterpiece were issued the second draw from Plaintiffs' Construction

Loan in January 2009, Defendant Mumper deposited these funds into his account with Defendant Wilmington Trust.

101. Upon information and belief, after Mumper/Masterpiece went out of business, Defendant Wilmington Trust seized Mumper's account and used the funds which were illegally and improperly drawn from Plaintiffs' construction loan to pay Mumper/Masterpiece's other outstanding obligations, and these funds, drawn directly from Plaintiffs' construction loan, were not used against the balance of monies owed with regard to Plaintiffs' property.

102. The representations of Defendants GLM, Tate, and Wilmington Trust were false, deceptive, confusing and misleading.

103. As a result of the improper, fraudulent, and deceptive conduct of Defendants GLM, Tate, and Wilmington Trust, Plaintiffs Weinstein have suffered substantial damages in excess of $800,000.00, plus interests, attorney's fees, and costs.

**COUNT V**
**UNJUST ENRICHMENT**
**(Plaintiffs v. Defendant Wilmington Trust)**

104. Plaintiffs hereby incorporate paragraphs 1 through 103 as if the same were set forth herein at length herein.

105. In or about February 2009, approximately two (2) weeks after Mumper/Masterpiece had obtained the second draw of $166,032.23 from Plaintiffs' Construction Loan and had deposited these funds into the account held by Mumper at Defendant Wilmington Trust, Mumper/Masterpiece suddenly went out of business.

106. Upon information and belief, Defendant Wilmington Trust seized the funds in Mumper's account, which included $166,032.23 of funds directly from Plaintiffs, and used these

funds toward Mumper's other outstanding obligations, without putting them toward the outstanding obligations owed by Mumper/Masterpiece related to Plaintiffs' property.

107.    Defendant Wilmington Trust has not returned and of these funds to Plaintiffs.

108.    The elements of a claim for unjust enrichment are: (1) Benefits conferred on defendant by plaintiff; (2) Appreciation of such benefits by defendant; and (3) Retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.  Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 419 (E.D. Pa. 2006).

109.    The claim of unjust enrichment simply requires that plaintiff "confer" benefits on a defendant; it does not require that plaintiff "directly confer" those benefits. Other courts have rejected the requirement that a plaintiff must directly confer a benefit on a defendant in order to allege unjust enrichment.

Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 420 (E.D. Pa. 2006)

110.    Plaintiffs have conferred a benefit on Defendant Wilmington Trust by allowing Defendant to satisfy outstanding obligations of its customer, Mumper/Masterpiece.

111.    Said benefit has been appreciated by Defendant Wilmington Trust, as it has been able to satisfy obligations it would otherwise have been liable for by using Plaintiffs' funds which were improperly obtained by its customer, Mumper/Masterpiece.

112.    Defendant Wilmington Trust has retained the benefits conferred by Plaintiff, despite the fact that it is inequitable for Defendant to do so.

113.    Accordingly, Defendant has been unjustly enriched by retaining funds Mumper/Masterpiece obtained directly from Plaintiffs, without payment of value, to the detriment of Plaintiffs.

**COUNT VI**
**EQUITABLE LIEN**
**(Plaintiffs v. Defendant Wilmington Trust)**

114. Plaintiffs hereby incorporate paragraphs 1 through 113 as if the same were set forth herein at length herein.

115. In or about February 2009, approximately two (2) weeks after Mumper/Masterpiece had obtained the second draw of $166,032.23 from Plaintiffs' Construction Loan and had deposited these funds into the account held by Mumper at Defendant Wilmington Trust, Mumper/Masterpiece suddenly went out of business.

116. Upon information and belief, Defendant Wilmington Trust seized the funds in Mumper's account, which included $166,032.23 of funds directly from Plaintiffs, and used these funds toward Mumper's other outstanding obligations, without putting them toward the outstanding obligations owed by Mumper/Masterpiece related to Plaintiffs' property.

117. Defendant Wilmington Trust has not returned and of these funds to Plaintiffs.

118. An equitable lien is a remedy "imposed to protect against and disgorge any unjust enrichment." Harold ex rel. Harold v. McGann, 406 F. Supp. 2d 562, 579 (E.D. Pa. 2005).

119. Section 160 of the Restatement of Restitution states that "Where property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched, an equitable lien arises." § 160; *See also* Zions First Nat. Bank, N.A. v. United Health Club, Inc., 704 F.2d 120, 124 (3d Cir. 1983).

120. Accordingly, Defendant Wilmington Trust has been unjustly enriched, and Plaintiffs are entitled to the imposition of an equitable lien upon the funds improperly held by Defendant Wilmington Trust.

**COUNT VII**
**CONSTRUCTIVE TRUST**
**(Plaintiffs v. Defendant Wilmington Trust)**

121. Plaintiffs hereby incorporate paragraphs 1 through 120 as if the same were set forth herein at length herein.

122. In or about February 2009, approximately two (2) weeks after Mumper/Masterpiece had obtained the second draw of $166,032.23 from Plaintiffs' Construction Loan and had deposited these funds into the account held by Mumper at Defendant Wilmington Trust, Mumper/Masterpiece suddenly went out of business.

123. Upon information and belief, Defendant Wilmington Trust seized the funds in Mumper's account, which included $166,032.23 of funds directly from Plaintiffs, and used these funds toward Mumper's other outstanding obligations, without putting them toward the outstanding obligations owed by Mumper/Masterpiece related to Plaintiffs' property.

124. Defendant Wilmington Trust has not returned and of these funds to Plaintiffs.

125. Pennsylvania courts recognize that a constructive trust "is not really a trust at all but rather an equitable remedy." Louis Dolente & Sons v. U.S. Fid. & Guar. Corp., 252 F. Supp. 2d 178, 182 (E.D. Pa. 2003)

126. The theory underlying the constructive trust doctrine is that "[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." Id.

127. There is "no rigid standard for determining whether the facts of a particular case require a court of equity to impose a constructive trust; the test is whether or not unjust enrichment can thereby be avoided." Louis Dolente & Sons v. U.S. Fid. & Guar. Corp., 252 F. Supp. 2d 178, 182 (E.D. Pa. 2003). "Thus, courts have observed that, if the remedy of

constructive trust can prevent unjust enrichment, it may be employed even though the acquisition of the property was not wrongful and the defendant's intention was not malign." Id.

128. Plaintiffs have conferred a benefit on Defendant Wilmington Trust by allowing Defendant to satisfy outstanding obligations of its customer, Mumper/Masterpiece.

129. Said benefit has been appreciated by Defendant Wilmington Trust, as it has been able to satisfy obligations it would otherwise have been liable for by using Plaintiffs' funds which were improperly obtained by its customer, Mumper/Masterpiece.

130. Defendant Wilmington Trust has retained the benefits conferred by Plaintiff, despite the fact that it is inequitable for Defendant to do so.

131. Accordingly, Defendant has been unjustly enriched, and Plaintiffs are entitled to the imposition of a constructive trust on the funds improperly held by Defendant Wilmington Trust.

**COUNT VII**
**INJUNCTION**

132. Plaintiffs hereby incorporate paragraphs 1 through 130 as if the same were set forth herein at length herein.

133. Plaintiffs request this Honorable Court to immediately enjoin Chase from making any further reports to any credit bureaus or any third parties regarding or relating to Mortgage Loan #1175273688/Construction Loan #004270400005829 of Dana and Brett Weinstein until this litigation is concluded.

134. The continuing conduct by Chase of making inaccurate and false reports to the third party credit bureau agencies is having a devastating effect on the ability of Plaintiff

Weinsteins to engage in productive lives, business affairs and other financial affairs and cannot simply be compensated by money damages.

**WHEREFORE**, Plaintiffs, Brett and Dana Weinstein, by and through their undersigned counsel, respectfully request judgment against Defendants JP Morgan Chase/Chase Financial, Robert Tate, Granite Loan Management, LLC, Wilmington Trust, N.A., Equifax Credit Information Services, Inc., Experian, Trans Union, and John Doe individual and/or entity, jointly and severally, in an amount of $800,000.00 for all claims contained herein, together with a constructive trust, an equitable lien, injunctive relief, attorney's fees, treble damages, punitive damages and such other relief as this Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury of all issues so triable.

**SHULICK LAW OFFICES**

By: ______________________________

**DAVID T. SHULICK, ESQUIRE**
**DANA K. COYNE, ESQUIRE**
Two Logan Square, Suite 1900
100 N. 18th Street
Philadelphia, PA 19103
(215) 988-5488
david@shulicklaw.com
dcoyne@shulicklaw.com

Dated: 1/24/12

# Exhibit A



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRETT and DANA WEINSTEIN,<br>2623 Condor Circle<br>Norristown, PA 19403,<br><br>Husband and Wife,<br><br>Plaintiffs,<br><br>v.<br><br>JP MORGAN CHASE/CHASE FINANCIAL,<br>270 Park Avenue<br>New York, NY 10017-2070<br><br>Defendant. | : | CIVIL ACTION COMPLAINT<br><br>11 1836<br><br>NO:<br><br>JURY TRIAL DEMANDED<br><br>FILED MAR 14 2011 |

CIVIL ACTION COMPLAINT

Plaintiffs, Brett and Dana Weinstein, husband and wife, by and through their undersigned counsel, David T. Shulick, Esquire, herein file a Civil Action Complaint, and in support thereof, aver as follows:

1. Plaintiffs, Brett and Dana Weinstein (hereinafter "Weinstein"), are residents of the Commonwealth of Pennsylvania, whose residence is located at 2623 Condor Circle, Norristown, Pennsylvania.

2. Defendant, JP Morgan Chase/Chase Financial, is, upon information and belief, a Delaware Corporation with headquarters in New York, with a principal place of business located at 270 Park Avenue, New York, New York.

JURISDICTION/VENUE

3. Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiffs and Defendant are citizens and/or are incorporated and have their principal place of

business in different states. Plaintiffs are citizens and residents of the Commonwealth of Pennsylvania and Defendant is a citizen and resident of the State of New York and/or the State of Delaware. Further, Defendant's headquarters are located in the State of New York and/or the State of Delaware. Thus, there is complete diversity between Plaintiffs and Defendants pursuant to appropriate statutory authorities.

4. Venue for this action is properly laid in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(a)(2) in that all or a substantial part of the events giving rise to this claim (the "contractual dealings") occurred in that district.

5. The amount in controversy is significantly in excess of $125,000.00.

**FACTUAL BACKGROUND**

6. On or around December 2007, Plaintiffs, Brett and Dana Weinstein, acquired Lot 8 of the community known as "Highgrove" in Tredyffrin Township, Chester County, Pennsylvania, with the intention of building their dream home. Plaintiffs, upon initial inspection of the property, were informed that all of the properties in the Highgrove community were to be built by Masterpiece Homes. Plaintiffs paid a sum of $930,000.00 for this property.[1]

7. The Real Estate closing for Lot 8 at Highgrove occurred on or about December 14, 2007, at which point, Plaintiffs Weinsteins paid a total of $223,595.00 in cash to the Title Company, Grateful Abstract. A true and correct copy of the HUD Settlement Statement for the property closing is attached hereto and incorporated herein as Exhibit "A."

8. In order to fully finance the construction of their dream home, Plaintiffs Weinstein obtained a Construction Loan from Defendant Chase. A true and correct copy of the Construction Loan Agreement is attached hereto and incorporated herein as Exhibit "B."

[1] Robert Tate, a loan officer of Wells Fargo, who subsequently moved to Chase, but is currently again employed by Wells Fargo, acted as the agent. The Weinsteins originally financed the $930,000.00 lot purchase through Chase, which was then paid off through the Construction Loan, which is the subject of this litigation.

9.    Significantly, as part of the transaction by and between Plaintiffs and Defendant, Plaintiffs Weinstein paid Defendant Chase for a diligent search of Mumper/Masterpiece Homes before Masterpiece was approved by Defendant Chase. Defendant Chase specifically and affirmatively approved Mumper/Masterpiece Homes as a qualified builder with qualified assets, experience and other related credentials.

10.    Following the approval of Mumper/Masterpiece Homes by Defendant Chase, Plaintiffs Weinstein entered into a Construction Agreement with Stephen Mumper of Masterpiece Homes of Villanova, Pennsylvania to construct a residence thereon for an additional sum of approximately $1,500,000.00.

11.    After Plaintiffs Weinstein entered the Construction Agreement with Masterpiece Homes, Plaintiffs paid a total of $117,500.00 directly to Masterpiece Homes between March 2008 and September 2008.

12.    On or about September 29, 2008, Plaintiffs Weinstein made settlement on the Construction Loan to be financed by Defendant Chase. At this settlement, Plaintiffs paid $372,236.65. A true and correct copy of the HUD Settlement Statement for the Chase Construction Loan closing and checks made payable to Grateful Abstract are attached hereto and incorporated herein as Exhibit "C."

13.    The Construction Loan Agreement had several specific clauses in it, including the following:

a.    Definition 1.2, "General Contractor" means MASTERPIECE HOMES.

b.    Paragraph 5.2 reads "Draw Requests" – Borrower shall have submitted and Lender shall have approved a Draw Request and a form required by Lender ("Draw Request"), signed by both Borrower and General Contractor for each disbursement

requested. The Draw Request shall be submitted to Lender at least seven (7) days prior to the requested disbursement. No more than one (1) Draw Request shall be submitted during any calendar month. If Borrower executes a "Delegation of Authority", or its equivalent, whereby Borrower delegates to the General Contractor authority to be sole signatory to Draw Requests, such delegation of authority is hereby incorporated into this Loan Agreement.

c. Paragraph 5.3 reads "Notice from Inspector" – Lender shall have received notice from the Inspector hired for the sole purpose of protecting Lender's collateral, and to provide information to Lender regarding the percentage completion of the improvements.

d. Paragraph 5.7 reads "Construction" – "the improvements are being constructed timely and erected entirely…in strict compliance with all applicable laws, ordinance, plaques, restrictions…in a good and workmanlike manner free from mechanic's liens…with materials and workmanship of the highest quality…in strict accordance with the plans…"

e. Paragraph 5.10 reads "Amount of Disbursements – the aggregate amount of all previous disbursements under this loan agreement, plus the amount being currently requested does not exceed the lesser of (a) the value of labor and materials expended for and physically incorporated into the improvements through the date of the then-currently requested disbursement as approved by the Lender or the amount allocated by the Lender to the stage of completion for the improvements as of the date of the then-currently requested disbursement.

f.    Paragraph 5.11 reads "Liminal disbursement – The then-currently requested disbursement shall not reduce the construction fund to an amount below the amount needed to pay for the labor and materials that, in Lenders sole and absolute and arbitrary judgment, it is necessary to complete the improvements according to the plans. Disbursements to fund overhead line items shall be made proportionate to the percentage to which the improvements have been completed in accordance with the budget as conclusively determined by Lender in its sole absolute and arbitrary discretion…"

g.    Paragraph 6.2, entitled "Disbursement Against Promissory Note of Construction Fund Rates – Each disbursement shall be made against the Note and the Construction Fund by increasing the amount of the outstanding principal under the Note to the extent loan proceeds are used. The available amount remaining for disbursement of the Construction Fund will be reduced by any amount of any disbursement against the Construction Fund…"

h.    Paragraph 7, entitled "Effective Signing Draw Requests – By executing a Draw Request, Borrower is:

(i)    representing that Borrower has inspected the improvements and certifies that the improvements are consistent with the plans;

(ii)    representing that the improvements are satisfactory in all respects to the Borrower;

(iii)    representing to Lender that the percentage completion of the improvements is equal to, or greater than, the percentage of the Construction Fund that has been disbursed; and

(iv)    releases Lender from any and all claims ...that are attributable to acts or omissions occurring before the date the Borrower executes the Draw Request and holds Lender harmless for any of Lender's agent's activities...

i.    Paragraph 11.3 entitled "Inspection - Lender, and its agents... shall have the right but not the obligation, to enter upon the real property without notice to inspect the improvements..."

j.    Paragraph 12, entitled "Events of Default", has a series of default provisions, starting at Paragraph 12.1 and ending at Paragraph 12.17.   Specifically, Paragraph 12.14 and 12.15 relate to abandonment of the construction for up to sixty (60) days or timely completion of construction.

k.    Paragraph 15.15 of the Loan Agreement, entitled "Controlling Law" reads "This Loan Agreement is entered into in the State and shall be controlled and interpreted by the laws of the State except to the extent preempted by Federal Law.   Further, Paragraph 1 of the Loan Agreement defines State as "Pennsylvania".

l.    Paragraph 15.18, entitled "Enforceability Rights", reads "The language of all provisions of this Loan Agreement shall be construed according to its fair meaning and strictly against any party... [as Agreement was written as a form agreement by Defendant J.P. Morgan Chase]".

*See* Exhibit "B."

14.    In or around October 2008, another prospective homeowner in "Highgrove", Scott Irvine, had entered into an agreement for what is believed to be Lot 12 in the "Highgrove" Development, along with a Construction Agreement with Steve Mumper of Masterpiece Homes

of Villanova, PA. Irvine also entered into a Construction Loan Agreement with Defendant Chase for a home to be built that would cost approximately $2,500,000.00. However, Irvine, unlike Weinstein, paid an additional $750,000.00 +/- directly to Masterpiece Homes, while Weinstein utilized the construction financing.[2] True and correct copies of the Irvine Agreements will be produced during discovery of this matter.

15.    As a result of Defendant Chase's improper and illegal conduct, as further set forth herein, Mumper/Masterpiece Homes obtained improper payments by Defendant Chase, charged against Plaintiffs' Construction Loan, as follows:

    a.    September 16, 2008 - $130,000.00

    b.    January 28, 2009    - $166,032.23

A true and correct copy of the Draw Requests are attached hereto and incorporated herein as Exhibit "D."

16.    The September 16, 2008 draw was allegedly for purposes, including, but not limited to Mumper/Masterpiece completing the foundation for Plaintiffs' home and Mumper/Masterpiece forwarding payment to the architectural firm retained to design the construction project.

17.    Although the initial draw on Plaintiffs' Construction Loan made by Mumper/Masterpiece Homes was to be used for paying the architectural firm, in or around February 2009, the architect on the project issued an invoice to Plaintiffs Weinstein for approximately $30,000.00, indicating that Masterpiece had never issued payment.

18.    Notwithstanding the fact that the work for which Mumper/Masterpiece allegedly was to use the September 16, 2008 draw had not been completed, a second draw was issued from

---

[2] Irvine had identical transactions as Weinsteins: his original lot financing was through Chase, and then rolled into Chase, as was the Weinsteins and he used Mumper/Masterpiece for the construction of his home.

Defendant Chase to Mumper/Masterpiece on January 28, 2009. This draw was allegedly to be for additional site work to be performed on the property, which was not completed.

19. On or about February 2009, just two (2) weeks after Mumper/Masterpiece received its second draw from Plaintiffs' Construction Loan, Mumper/Masterpiece closed its doors without any notice or warning to Plaintiffs and subsequently filed for bankruptcy.

20. Due to the closing of Masterpiece Homes, Plaintiffs Weinstein have been forced to redesign their home with a new architect. This cost Plaintiffs an additional $15,000.00. Additionally, the new plans for the home require that the foundation poured on the site be completely removed, which will cost Plaintiffs an additional $100.000.00. Significantly, Chase had notice of the Masterpiece financial problems and never disclosed those to Weinstein. Attached hereto and incorporated herein as Exhibit "E" are copies of correspondences to and from the Architect, Michael Visich, showing how the Masterpiece initial payments to him 'bounced' and the checks were returned, and the Exhibit further proves that Masterpiece banked at Chase, and Chase had full access to Masterpiece's financials at all relevant times, and has a delinquent and/or increasing credit card balance with Chase at all relevant times.

21. Upon information and belief, both of the aforementioned draws which Mumper/Masterpiece Homes obtained from Defendant Chase are at issue in this litigation, in that they were improper, ultra vires, and illegal.

22. Further, these draws were manifested not for the benefit of the Weinsteins, but for the benefit of Defendant Chase who knew, or should have known, of the dire financial situation of Mumper/Masterpiece.

23.    Nevertheless, Defendant Chase, upon information and belief, approved these draws without corresponding construction work being manifested on Plaintiffs' property, including, without limitation, foundation, site, framing, and otherwise.

24.    At all times relevant hereto, Defendant Chase was aware of the financial situation of Mumper/Masterpiece, the bankruptcy proceedings, and the issues that they have caused in delaying – and then halting – the construction of Plaintiffs' home.

25.    At all times relevant hereto, Plaintiffs Weinstein have been timely making all mortgage payments to Defendant Chase in an effort to maintain their previously-outstanding personal credit with the three (3) credit reporting agencies, Equifax, Experian and TransUnion. In fact, although the Plaintiffs' monthly payment was approximately $1,500.00, Plaintiffs had consistently been paying Defendant Chase $2,000.00 per month.

26.    Without any prior notice, as Plaintiffs Weinstein had timely made all monthly mortgage payments to Defendant Chase, on or about September 28, 2010, Plaintiffs received notice from a "Default Payment Specialist" of Defendant Chase that Plaintiffs' payment was being returned.   A true and correct copy of this correspondence is attached hereto and incorporated herein as Exhibit "F."

27.    On or about September 29, 2010, Plaintiffs Weinstein received notice from the law firm of Phelan, Hallinan & Schmeig, LLP, indicating the intention of Defendant Chase to foreclose on the Construction Loan.  A true and correct copy of this correspondence is attached hereto and incorporated herein as Exhibit "G."

28.    Notwithstanding the September 2010 notices, Plaintiffs Weinstein have continued to forward payments to Defendant Chase, all of which have been returned.  The last check from Plaintiffs which was deposited by Defendant Chase was deposited in August 2010.

29.     On or about October 5, 2009, Plaintiffs Weinstein contacted Defendant Chase requesting an extension of the of the proposed completion date to July 31, 2010, due to the fact that Masterpiece Homes was no longer in business and would not be completing the construction of their home.  Thus, at this point in time, Defendant Chase had not only received actual and/or constructive notice from Mumper/Masterpiece that construction would no longer be continuing on Plaintiffs' residence, they had also received actual notice from Plaintiffs Weinstein.  A true and correct copy of this correspondence is attached hereto and incorporated herein as Exhibit "H."

30.     Additionally, on or about October 11, 2010, Plaintiffs Weinstein contacted Phelan, Hallinan & Schmeig, LLP disputing the validity of the September 29, 2010 correspondence indicating Defendant Chase's intent to foreclose on the Construction Loan.  A true and correct copy of this correspondence is attached hereto and incorporated herein as Exhibit "I."

31.     On or about October 21, 2010, Plaintiffs Weinstein received correspondence from Phelan, Hallinan & Schmeig, LLP indicating that the intent of Defendant Chase to foreclose on the Construction Loan was valid.  A true and correct copy of this correspondence is attached hereto and incorporated herein as Exhibit "J."

32.     In or about December 2010, Plaintiffs Weinstein received notification that Defendant Chase had issued negative reports to the three (3) credit reporting agencies, Equifax, Experian and TransUnion, falsely indicating that Plaintiffs were behind on their mortgage payments.

33. On or about January 26, 2010, Plaintiffs Weinstein received a Notice of Default from Defendant Chase. A true and correct copy of this notice is attached hereto and incorporated herein as Exhibit "K."

34. Upon information and belief, Defendant Chase had actual and/or constructive notice of Masterpiece's financial issues as a result of being inextricably intertwined with the Irvine Funds paid to and from Masterpiece Builders, and other related matters, which Defendant Chase did not disclose to the Weinsteins.

35. As a direct and proximate result, Plaintiffs Weinstein have incurred substantial damages in excess of $800,000.00.

**COUNT I - LENDER LIABILITY:**
**BREACH OF CONTRACT AND DUTY OF GOOD FAITH**

36. Plaintiffs hereby incorporate paragraphs 1 through 35 as if the same were set forth herein at length herein.

34. Plaintiffs Weinstein entered into a mortgage agreement in order to finance the building of their home. *See* Construction Agreement, attached hereto and incorporated herein as Exhibit "B."

35. Under the Agreement, Defendant Chase was to inspect Plaintiffs' property and ensure that all work thereon alleged to have been performed by Mumper/Masterpiece Homes was completed before issuing funds to Mumper/Masterpiece.

36. Mumper/Masterpiece Homes failed to complete the work on Plaintiffs' property. Nevertheless, Defendant Chase issued two (2) draws to Mumper/Masterpiece homes, in the amounts of $130,000.00 and $166,032.23. See Exhibit "D."

37. Just two (2) weeks after the second draw that Defendant Chase issued to Mumper/Masterpiece Homes, Masterpiece closed its doors and filed for bankruptcy. No further work was completed on Plaintiffs' home.

38. At all times relevant hereto, Defendant Chase had actual and/or constructive knowledge of the dire financial situation of Mumper/Masterpiece Homes, but did not disclose this information to Plaintiffs Weinstein.

39. Upon information and belief, Defendant Chase had actual and/or constructive notice of Masterpiece's financial issues as a result of being inextricably intertwined with the Irvine Funds paid to and from Masterpiece Builders, and other related matters, which Defendant Chase did not disclose to the Weinsteins.

40. Accordingly, Defendant Chase breached the Agreement with Plaintiffs Weinstein by issuing funds to Mumper/Masterpiece Homes without performing the necessary inspections to ensure that the necessary work had been completed.

41. Furthermore, in addition to breaching the Agreement itself, Defendant Chase also breached its duty of good faith in their dealings with Plaintiffs Weinstein.

42. Every contract imposes upon each party a duty of good faith and fair dealing in the contract's performance and enforcement. *Busy Bee, Inc. v. Wachovia Bank*, 2006 WL 723487 at *28 (Feb. 2006), citing *Cable & Associates Insurance Agency v. Commercial National Bank of Pennsylvania*, 875 A.2d 361, 364 (Pa.Super.2005)

43. The duty of good faith requires that the parties to a contract conduct themselves with honesty in the transaction.

44. Furthermore, Defendant Chase, a large-scale financial institution, was in a significantly superior position to Plaintiffs Weinstein with reference to the issue of Mumper/Masterpiece Homes declaring bankruptcy.

45. Defendant Chase used their superior position to the detriment of Plaintiffs Weinstein, and further, Chase, upon information and belief intentionally deceived Plaintiffs to keep as much business flowing to Masterpiece, Mumper, because Masterpiece and Mumper were liable and in debt to Chase, so Chase had at all relevant times and inherent and untenable conflict of interest between Plaintiffs, its own assets, and Masterpiece, Mumper's assets, which was not disclosed to Plaintiffs.

46. As a result of both Defendant Chase's breach of the Agreement and Defendant Chase's breach of the duty of good faith, Plaintiffs Weinstein have suffered significant economic harm in excess of $800,000.00.

**COUNT II – LENDER LIABILITY – MISREPRESENTATION**
**A. NEGLIGENT MISREPRESENTATION**

47. Plaintiffs hereby incorporate paragraphs 1 through 46 as if the same were set forth herein at length herein.

48. Plaintiffs Weinstein secured a Construction Loan from Defendant Chase. *See* Construction Agreement, attached hereto and incorporated herein as Exhibit "B."

49. Under the Loan Agreement, Defendant Chase negligently misrepresented to Plaintiffs Weinstein that no funds would be advanced to Mumper/Masterpiece Homes without respective, proportionate construction being completed.

50. Defendant Chase failed to properly inspect and investigate Mumper/Masterpiece Homes before issuing draws to Masterpiece in the amounts of $130,000.00 and $166,032.23. *See* Exhibit "D."

51. This failure to properly inspect and investigate constituted a failure to exercise reasonable care in evaluating Masterpiece and a failure to exercise reasonable in approving the draws, constituting a breach of the duty owed to Plaintiffs Weinstein.

52. The misrepresentations made by Defendant Chase to Plaintiffs Weinstein were material to the transactions, in that Plaintiffs relied upon Defendant to fully investigate Mumper/Masterpiece before disbursing to the builder funds for which Plaintiffs were responsible. Further, Chase had notice of the Masterpiece financial problems and never disclosed those to Weinstein. Attached hereto and incorporated herein as Exhibit "E" are copies of correspondences to and from the Architect, Michael Visich, showing how the Masterpiece initial payments to him 'bounced' and the checks were returned, and the Exhibit further proves that Masterpiece banked at Chase, and Chase had full access to Masterpiece's financials at all relevant times.

53. Upon information and belief, the draws issued to Masterpiece Homes were manifested not for the benefit of Plaintiffs Weinstein, but for the benefit of Defendant Chase, who knew, or should have known, of the dire financial situation of Mumper/Masterpiece, but who, upon information and belief, approved these draws without corresponding construction work being manifested on Plaintiffs' property. Further, Chase, upon information and belief intentionally deceived Plaintiffs to keep as much business flowing to Masterpiece, Mumper, because Masterpiece and Mumper were liable and in debt to Chase, so Chase had at all relevant

times and inherent and untenable conflict of interest between Plaintiffs, its own assets, and Masterpiece, Mumper's assets, which was not disclosed to Plaintiffs.

54. As a result of the improper, illegal, and ultra vires conduct of Defendant Chase in negligently misrepresenting to Plaintiffs Weinstein that the proper inspections were taking place with regard to the approval of the two (2) draws to Masterpiece Homes and subsequently, Plaintiffs Weinstein have suffered substantial economic harm in excess of $800.000.00.

**COUNT II – LENDER LIABILITY – MISREPRESENTATION**
**B. FRAUDULENT MISREPRESENTATION**

55. Plaintiffs hereby incorporate paragraphs 1 through 54 as if the same were set forth herein at length herein.

56. Plaintiffs Weinstein secured a Construction Loan from Defendant Chase. *See* Exhibit "B."

57. Under the Loan Agreement, Defendant Chase fraudulently misrepresented to Plaintiffs Weinstein that no funds would be advanced to Mumper/Masterpiece Homes without respective, proportionate construction being completed.

58. Defendant Chase failed to properly inspect and investigate Mumper/Masterpiece Homes before issuing draws to Masterpiece in the amounts of $130,000.00 and $166,032.23. *See* Exhibit "D."

59. At all times relevant hereto, Defendant Chase knew of the dire financial situation of Mumper/Masterpiece homes.

60. Despite this knowledge, Defendant Chase continued to disburse funds to Mumper/Masterpiece, while representing to Plaintiffs Weinstein that Mumper/Masterpiece were performing the work on Plaintiffs home in a manner that was satisfactory to Defendant.

61. The misrepresentations made by Defendant Chase to Plaintiffs Weinstein were material to the transactions, in that Plaintiffs relied upon Defendant to fully investigate Mumper/Masterpiece before disbursing to the builder funds for which Plaintiffs were responsible.

62. The misrepresentations made by Defendant Chase were made solely with the intent of misleading Plaintiffs Weinstein.

63. Upon information and belief, the draws issued to Masterpiece Homes were manifested not for the benefit of Plaintiffs Weinstein, but for the benefit of Defendant Chase, who knew, or should have known, of the dire financial situation of Mumper/Masterpiece, but who, upon information and belief, approved these draws without corresponding construction work being manifested on Plaintiffs' property. Furthermore, Chase, upon information and belief intentionally deceived Plaintiffs to keep as much business flowing to Masterpiece, Mumper, because Masterpiece and Mumper were liable and in debt to Chase, so Chase had at all relevant times and inherent and untenable conflict of interest between Plaintiffs, its own assets, and Masterpiece, Mumper's assets, which was not disclosed to Plaintiffs.

64. As a result of the improper, illegal, and ultra vires conduct of Defendant Chase in fraudulently misrepresenting to Plaintiffs Weinstein that the proper inspections were taking place with regard to the approval of the two (2) draws to Masterpiece Homes and subsequently, Plaintiffs Weinstein have suffered substantial economic harm in excess of $800,000.00.

**COUNT III - LENDER LIABILITY**
**BREACH OF FIDUCIARY DUTY**

65. Plaintiffs hereby incorporate paragraphs 1 through 64 as if the same were set forth herein at length herein.

66.    A fiduciary relationship existed between Plaintiffs Weinstein, Defendant Chase, and Mumper/Masterpiece homes, stemming from the parties Construction Loan Agreement.

67.    A fiduciary duty is created by a lender creates where lender exercises substantial control over the borrower's business affairs. *Busy Bee, Inc. v. Wachovia Bank*, 2006 WL 723487 at *22 (Feb. 2006), citing *G.E. Capital Mortgage Services, Inc. v. Pinnacle Mortgage Investment Corp.*, 897 F.Supp. 854, 863 (E.D.Pa.1995); Blue Line Coal Co., Inc. v. Equibank, 683 F.Supp. 493, 496 (E.D.Pa.1988); Stainton v. Tarantino, 637 F.Supp. 1051, 1066 (E.D.Pa.1986).

68.    Defendant Chase was sufficiently involved in the business transactions of Mumper/Masterpiece in that they took control of the funds of Plaintiffs' Construction Loan and disbursed them as they saw fit, with no involvement on the part of Plaintiffs.    Significantly, Chase had notice of the Masterpiece financial problems and never disclosed those to Weinstein. Attached hereto and incorporated herein as Exhibit "E" are copies of correspondences to and from the Architect, Michael Visich, showing how the Masterpiece initial payments to him 'bounced' and the checks were returned, and the Exhibit further proves that Masterpiece banked at Chase, and Chase had full access to Masterpiece's financials at all relevant times.

69.    Further, Defendant Chase was aware of the dire financial situation of Mumper/Masterpiece, did not disclose this information to Plaintiffs Weinstein, and continued to provide funds to Mumper/Masterpiece despite this knowledge.

70.    As a result, Defendant Chase was in a fiduciary relationship with Plaintiffs Weinstein, and, accordingly, breached that duty.  Further, Chase, upon information and belief intentionally deceived Plaintiffs to keep as much business flowing to Masterpiece, Mumper, because Masterpiece and Mumper were liable and in debt to Chase, so Chase had at all relevant

times and inherent and untenable conflict of interest between Plaintiffs, its own assets, and Masterpiece, Mumper's assets, which was not disclosed to Plaintiffs.

71. As a result of the breach of fiduciary duty on the part of Defendant Chase, Plaintiffs Weinstein have suffered significant economic harm in excess of $800.000.00.

**COUNT IV**
**VIOLATION OF THE FAIR CREDIT REPORTING ACT (15 U.S.C. § 1681, et seq.)**

72. Plaintiffs hereby incorporate paragraphs 1 through 71 as if the same were set forth herein at length herein.

73. The Fair Credit Reporting Act (hereinafter "FCRA"), 15 U.S.C. § 1681, et seq., requires any creditor reporting to any of the credit bureaus in the United States to do so accurately.

74. Plaintiffs Weinstein are 'persons' and 'customers' as defined in the FCRA. 15 U.S.C. §1681a(b); 15 U.S.C. §1681a(c).

75. Defendant Chase is a 'furnisher of information to consumer reporting agencies' as defined in the FCRA. 15 U.S.C. §1681s-2.

76. On or about December 2010, Plaintiffs retrieved their credit reports, reflecting negative information from Defendant Chase which has negatively affected Plaintiffs' credit rating.

77. Defendant Chase indicated to three (3) credit reporting agencies - Equifax, Experian and TransUnion - that Plaintiffs Weinstein were behind on their mortgage payments, when, in fact, Plaintiffs had been and continue to consistently make timely payments to Defendant Chase, which have been refused and returned to Plaintiffs.

78. Defendant Chase had a duty to ensure, in reporting information to credit reporting agencies, that "the information is, in fact, accurate." 15 U.S.C. § 1681s-2(a)(1)(B)(ii).

79. Pursuant to the FCRA, "[i]f any financial institution that extends credit and regularly and in the ordinary course of business furnishes information to a consumer reporting agency described in section 1681a(p) of this title furnishes negative information to such an agency regarding credit extended to a customer, the financial institution shall provide a notice of such furnishing of negative information, in writing, to the customer." 15 U.S.C. § 1681s-2(a)(7)(A)(i). Thus, Defendant had a duty to provide notice of any negative information.

80. Defendant has violated this duty owed Plaintiffs to ensure the accuracy of negative information on consumer reports.

81. As a result of the breach of fiduciary duty on the part of Defendant Chase, Plaintiffs Weinstein have suffered significant economic harm in excess of $800,000.00.

82. Plaintiff is entitled to actual damages and/or statutory damages sustained, as well as reasonable attorney's fees. 15 U.S.C. § 1681o.

**COUNT V**
**CONSUMER FRAUD AND VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, et. seq.)**

83. Plaintiffs hereby incorporate paragraphs 1 through 82 as if the same were set forth herein at length herein.

84. Plaintiffs are "persons" as defined under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(2).

85. Pennsylvania's Unfair Trade Practices and Consumer Protection Law defines "unfair methods of competition" and "unfair or deceptive acts or practices" as including:

(i) Passing off goods or services as those of another;

> (ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;
> (iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;
>
> . . .
> (vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;
>
> . . .
> (xii) Promising or offering prior to time of sale to pay, credit or allow to any buyer, any compensation or reward for the procurement of a contract for purchase of goods or services with another or others, or for the referral of the name or names of another or others for the purpose of attempting to procure or procuring such a contract of purchase with such other person or persons when such payment, credit, compensation or reward is contingent upon the occurrence of an event subsequent to the time of the signing of a contract to purchase;
>
> . . .
> (xiv) Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;
>
> . . .
> (xvi) Making repairs, improvements or replacements on tangible, real or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing;
>
> . . .
> (xxi) Engaging in any other fraudulent or deceptive conduct which creates likelihood of confusion or of misunderstanding.

73 P.S. § 201-2(4)

86. As part of the transaction by and between Plaintiffs and Defendant, Plaintiffs Weinstein paid Defendant Chase for a diligent search of Mumper/Masterpiece Homes <u>before Masterpiece was approved by Defendant Chase</u>. Defendant Chase specifically and affirmatively approved Mumper/Masterpiece Homes as a qualified builder with qualified assets, experience and other related credentials.

87. Defendant Chase represented that it would provide services to Plaintiffs Weinstein related to a builder approval and Construction Loan Agreement in that it would work

in good faith with Plaintiffs pursuant thereto, before Plaintiffs provided thousands upon thousands of dollars of fees to Defendant for said builder approval and related Construction Loan financing and services. However, Chase, upon information and belief intentionally deceived Plaintiffs to keep as much business flowing to Masterpiece, Mumper, because Masterpiece and Mumper were liable and in debt to Chase, so Chase had at all relevant times and inherent and untenable conflict of interest between Plaintiffs, its own assets, and Masterpiece, Mumper's assets, which was not disclosed to Plaintiffs.

88.    The representations of Defendant Chase were false, deceptive, confusing and misleading, as follows:

a.    Defendant Chase represented that no funds would be advanced on any loan agreement without respective, proportionate construction being completed.

b.    Chase failed to disclose that it had a separate and independent financial relationship with Steve Mumper of Masterpiece Homes, as it had significant additional exposure related to construction financing in the same "Highgrove" Development, including but not limited to other dealings with Mumper/Masterpiece Homes, having absolutely nothing to do whatsoever with Plaintiff Weinsteins. Further, Chase, upon information and belief intentionally deceived Plaintiffs to keep as much business flowing to Masterpiece, Mumper, because Masterpiece and Mumper were liable and in debt to Chase, so Chase had at all relevant times and inherent and untenable conflict of interest between Plaintiffs, its own assets, and Masterpiece, Mumper's assets, which was not disclosed to Plaintiffs.

89.    Plaintiffs Weinstein relied upon the misreerpresentations of Defendant Chase, which were made knowingly, or following the failure of Defendants to exercise due diligence to investigate the actions of Mumper/Masterpiece Homes. Significantly, Chase had notice of the

Masterpiece financial problems and never disclosed those to Weinstein. Attached hereto and incorporated herein as Exhibit "E" are copies of correspondences to and from the Architect, Michael Visich, showing how the Masterpiece initial payments to him 'bounced' and the checks were returned, and the Exhibit further proves that Masterpiece banked at Chase, and Chase had full access to Masterpiece's financials at all relevant times.

90. Upon information and belief, Chase utilized $350,000.00 of the Weinsteins' funds improperly, merely to protect its own financial interests and not, to further the financial interests of Plaintiff Weinsteins who were relying upon Chase to approve Mumper/Masterpiece Homes and further, to ensure that the construction was completed proportionately to the release of the construction funds relating to the $150,000.00 draws.

91. As a result of the improper and fraudulent conduct of Defendant Chase in approving the two (2) draws to Masterpiece Homes and subsequently attempting to foreclose on the Construction Loan, Plaintiffs Weinstein have suffered substantial damages in the amount of $713,331.65, plus interests, attorney's fees, and costs.

**COUNT VI**
**<u>INJUNCTION</u>**

92. Plaintiffs hereby incorporate paragraphs 1 through 52 as if the same were set forth herein at length herein.

93. Plaintiffs request this Honorable Court to immediately enjoin Chase from making any further reports to any credit bureaus or any third parties regarding or relating to Mortgage Loan #1175273688/Construction Loan #00427040005829 of Dana and Brett Weinstein until this litigation is concluded.

94. The continuing conduct by Chase of making inaccurate and false reports to the third party credit bureau agencies is having a devastating effect on the ability of Plaintiff Weinsteins to engage in productive lives, business affairs and other financial affairs and cannot simply be compensated by money damages.

**WHEREFORE**, Plaintiffs, Brett and Dana Weinstein, by and through their undersigned counsel, respectfully request judgment against the Defendant, JP Morgan Chase/Chase Financial, in an amount of $800,000.00 for all claims contained herein, together with injunctive relief, attorney's fees, treble damages, punitive damages and such other relief as this Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury of all issues so triable.

**SHULICK LAW OFFICES**

By: ______________________

**DAVID T. SHULICK, ESQUIRE**
Two Logan Square, Suite 1900
100 N. 18th Street
Philadelphia, PA 19103
(215) 988-5488
david@shulicklawoffices.com

Dated: 3/14/2011

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRETT WEINSTEIN and DANA WEINSTEIN,

Plaintiffs,

v.

JPMORGAN CHASE/CHASE FINANCIAL,

Defendant.

CIVIL ACTION NO. 11-1836

**DEFENDANT'S ANSWER TO PLAINTIFFS' COMPLAINT AND AFFIRMATIVE DEFENSES**

COMES NOW, Defendant JP Morgan Chase Bank, N.A., improperly named as JPMorgan Chase/Chase Financial (hereinafter, "Chase"), for its Answer and Affirmative Defenses to Plaintiffs' Complaint, states:

1. Denied. Chase denies the allegations contained in paragraph 1 of the Complaint because after reasonable investigation Chase is without sufficient knowledge or information to form a belief as to the truth of the allegations.

2. Denied. Chase denies the allegations contained in paragraph 2 of th Complaint.

**AS TO JURISDICTION/VENUE**

3. Denied. Chase denies the allegations contained in paragraph 3 of the Complaint as a conclusion of law to which no response is required.

4. Denied. Chase denies the allegations contained in paragraph 4 of the Complaint as a conclusion of law to which no response is required.

5. Denied. Chase denies the allegations contained in paragraph 5 of the Complaint as a conclusion of law to which no response is required.

**AS TO THE FACTUAL BACKGROUND**

6. Admitted in part, denied in part. Chase admits that at some point in time, Plaintiff acquired the property located at Lot 8 in the community known as "Highgrove" in Treddyffrin Township, Chester County, Pennsylvania and decided to build a home on said Lot. Chase denies the remaining allegations because after reasonable investigation Chase is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations.

7. Admitted in part, denied in part. Chase admits that the closing for Lot 8 occurred on or about December 14, 2007 and that a copy of the HUD-1 Settlement Sheet is attached to the Complaint as Exhibit "A", but denies the remaining allegations of paragraph 7 of the Complaint.

8. Admitted.

9. Denied. Chase denies the allegations contained in paragraph 9 of the Complaint.

10. Admitted in part, denied in part. Chase admits only that Plaintiffs entered into a Construction Agreement, but denies the remaining allegations contained in paragraph 10 of the Complaint.

11. Denied. Chase denies the allegations contained in paragraph 11 of the Complaint because after reasonable investigation Chase is without sufficient knowledge or information to form a belief as to the truth of the allegations.

12. Admitted in part, denied in part. The terms of the loan agreements are contained in documents which speak for themselves. Therefore, Chase admits so much of the allegations contain in paragraph 12 which are consistent with the loan agreements, and denies so much of the allegations which are not.

13. Admitted in part, denied in part. The Construction Loan Agreement is a document which speaks for itself. Therefore, Chase admits so much of the allegations contained in paragraph 13 which are consistent with the Construction Loan Agreement, and denies so much of the allegations which are not.

14. Denied. Chase denies the allegations contained in paragraph 14 of the Complaint because after reasonable investigation Chase is without sufficient knowledge or information to form a belief as to the truth of the allegations.

15. Denied. Chase denies the allegations contained in paragraph 15 of the Complaint.

16. Admitted in part, denied in part. Chase admits only that Dana Weinstein and Masterpiece Homes requested a draw disbursement by Draw Request on or about September 16, 2008, but denis the remaining allegations contained in paragraph 16 of the Complaint.

17. Denied. Chase denies the allegations contained in paragraph 17 of the Complaint because after reasonable investigation Chase is without sufficient knowledge or information to form a belief as to the truth of the allegations.

18. Denied. Chase must deny the allegations contained in paragraph 18 of the Complaint because it is unable to decipher what is being alleged.

19. Denied. Chase denies the allegations contained in paragraph 19 of the Complaint because after reasonable investigation Chase is without sufficient knowledge or information to form a belief as to the truth of the allegations.

20. Denied. Chase denies that it had any notice of Masterpiece's financial problems, nor that it has a duty to investigate, the loan document disclaiming any such duty. As to the remaining allegations contained in paragraph 20 of the Complaint, Chase denies them because

after reasonable investigation Chase is without sufficient knowledge or information to form a belief as to the truth of the allegations.

21. Denied. Chase denies the allegation contained in paragraph 21 of the Complaint.

22. Denied. Chase denies the allegation contained in paragraph 22 of the Complaint.

23. Denied. Chase denies the allegation contained in paragraph 23 of the Complaint.

24. Denied. Chase denies the allegation contained in paragraph 24 of the Complaint.

25. Denied. Chase must deny the allegations contained in paragraph 25 of the Complaint because the term "at all times relevant hereto," is vague, susceptible to various interpretations and Chase is unsure how it is being used by Plaintiffs.

26. Admitted in part, denied in part. Chase admits that the correspondence attached to the Complaint as Exhibit "F" is a copy of the correspondence sent by Chase to Plaintiffs, but denies the remaining allegations contained in paragraph 26 of the Complaint.

27. Denied. Chase must deny the allegation contained in paragraph 27 of the Complaint, because only one page of the letter is attached to the Complaint as Exhibit "F".

28. Denied. Chase denies the allegations contained in paragraph 28 of the Complaint.

29. Admitted in part, denied in part. Chase admits that at some point in time a request for an extension of the construction period was made by Plaintiff for the purpose of substituting or replacing Masterpiece as the builder, but denies the remaining allegations contained in paragraph 29 of the Complaint.

30. Admitted in part, denied in part. The correspondence attached as Exhibit "I" is a document which speaks for itself. Therefore, Chase admits so much of the allegations contained in paragraph 30 of the Complaint which are consistent with the correspondence, and denies so much of the allegations which are not.

31. Admitted in part, denied in part. The correspondence attached as Exhibit "J" is a document which speaks for itself. Therefore, Chase admits so much of the allegations contained in paragraph 31 of the Complaint which are consistent with the correspondence, and denies so much of the allegations which are not.

32. Denied. Chase denies the allegations contained in paragraph 32 of the Complaint because after reasonable investigation Chase is without sufficient knowledge or information to form a belief as to the truth of the allegations.

33. Admitted.

34. Denied. Chase denies the allegations contained in paragraph 34 of the Complaint.

35. Denied. Chase denies the allegations contained in paragraph 35 of the Complaint.

**AS TO COUNT I – LENDER LIABILITY: BREACH OF CONTRACT AND DUTY OF GOOD FAITH**

36. Chase incorporates its answers above as though more fully set forth herein at length.

34 [sic]. Admitted in part, denied in part. Chase admits that Plaintiffs entered into a finance transaction with Plaintiff, but denies the remaining allegations contained in paragraph 34 [sic] of the Complaint.

35 [sic]. Denied. Chase denies the allegations contained in paragraph 35 [sic] of the Complaint.

36 [sic]. Denied. Chase denies the allegations contained in paragraph 36 [sic] of the Complaint.

37. Admitted in part, denied in part. Chase admits that Stephen Mumper filed bankruptcy in October 2009, but denies the remaining allegations contained in paragraph 37 of the Complaint.

38. Denied. Chase denies the allegations contained in paragraph 38 of the Complaint.

39. Denied. Chase denies the allegations contained in paragraph 39 of the Complaint.

40. Denied. Chase denies the allegations contained in paragraph 40 of the Complaint.

41. Denied. Chase denies the allegations contained in paragraph 41 of the Complaint.

42. Denied. Chase denies the allegations contained in paragraph 42 as a conclusion of law to which no response is required.

43. Denied. Chase denies the allegations contained in paragraph 43 as a conclusion of law to which no response is required.

44. Denied. Chase denies the allegations contained in paragraph 44 of the Complaint.

45. Denied. Chase denies the allegations contained in paragraph 45 of the Complaint.

46. Denied. Chase denies the allegations contained in paragraph 46 of the Complaint.

**AS TO COUNT II – MISREPRESENTATION**
**A. NEGLIGENT MISREPRESENTATION**

47. Chase incorporates its answers above as though more fully set forth herein at length.

48. Admitted in part, denied in part. Chase admits only that the parties had a construction agreement with each other, but denies the remaining allegations contained in paragraph 48 of the Complaint.

49. Denied. Chase denies the allegations contained in paragraph 49 of the Complaint.

50. Denied. Chase denies the allegations contained in paragraph 50 of the Complaint.

51. Denied. Chase denies the allegations contained in paragraph 51 of the Complaint.

52. Denied. Chase denies the allegations contained in paragraph 52 of the Complaint.

53. Denied. Chase denies the allegations contained in paragraph 53 of the Complaint.

54. Denied. Chase denies the allegations contained in paragraph 54 of the Complaint.

**AS TO COUNT II – LENDER LIABILITY**
**B. FRAUDULENT MISREPRESENTATION**

55. Chase incorporates its answers above as though more fully set forth herein at length.

56. Admitted in part, denied in part. Chase admits only that the parties had a construction agreement with each other, but denies the remaining allegations contained in paragraph 56 of the Complaint.

57. Denied. Chase denies the allegations contained in paragraph 57 of the Complaint.

58. Denied. Chase denies the allegations contained in paragraph 58 of the Complaint.

59. Denied. Chase denies the allegations contained in paragraph 59 of the Complaint.

60. Denied. Chase denies the allegations contained in paragraph 60 of the Complaint.

61. Denied. Chase denies the allegations contained in paragraph 61 of the Complaint.

62. Denied. Chase denies the allegations contained in paragraph 62 of the Complaint.

63. Denied. Chase denies the allegations contained in paragraph 63 of the Complaint.

64. Denied. Chase denies the allegations contained in paragraph 64 of the Complaint.

**AS TO COUNT III – LENDER LIABILITY**
**BREACH OF FIDUCIARY DUTY**

65. Chase incorporates its answers above as though more fully set forth herein at length.

66. Denied. Chase denies the allegations contained in paragraph 66 of the Complaint.

67. Denied. Chase denies the allegations contained in paragraph 67 as a conclusion of law to which no response is required.

68. Denied. Chase denies the allegations contained in paragraph 68 of the Complaint.

69. Denied. Chase denies the allegations contained in paragraph 69 of the Complaint.

70. Denied. Chase denies the allegations contained in paragraph 70 of the Complaint.

71. Denied. Chase denies the allegations contained in paragraph 71 of the Complaint.

**AS TO COUNT IV – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT (15 U.S.C. § 1681, *et seq)***

72. Chase incorporates its answers above as though more fully set forth herein at length.

73. Denied. Chase denies the allegations contained in paragraph 73 of the Complaint as a conclusion of law to which no response is required.

74. Denied. Chase denies the allegations contained in paragraph 74 of the Complaint as a conclusion of law to which no response is required.

75. Denied. Chase denies the allegations contained in paragraph 75 of the Complaint as a conclusion of law to which no response is required.

76. Denied. Chase denies the allegations contained in paragraph 76 of the Complaint because after reasonable investigation Chase is without sufficient knowledge or information to form a belief as to the truth of the allegations.

77. Denied. Chase denies the allegations contained in paragraph 77 of the Complaint.

78. Denied. Chase denies the allegations contained in paragraph 78 of the Complaint.

79. Denied. Chase denies the allegations contained in paragraph 79 of the Complaint as a conclusion of law to which no response is required.

80. Denied. Chase denies the allegations contained in paragraph 80 of the Complaint.

81. Denied. Chase denies the allegations contained in paragraph 81 of the Complaint.

82. Denied. Chase denies the allegations contained in paragraph 82 of the Complaint.

**AS TO COUNT V – CONSUMER FRAUD AND VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (72 P.S. § 201-1, *et seq*)**

83. Chase incorporates its answers above as though more fully set forth herein at length.

84. Denied. Chase denies the allegations contained in paragraph 84 of the Complaint as a conclusion of law to which no response is required.

85. Denied. Chase denies the allegations contained in paragraph 85 of the Complaint as a conclusion of law to which no response is required.

86. Denied. Chase denies the allegations contained in paragraph 86 of the Complaint.

87. Denied. Chase denies the allegations contained in paragraph 87 of the Complaint.

88. Denied. Chase denies the allegations contained in paragraph 88 of the Complaint.

89. Denied. Chase denies the allegations contained in paragraph 89 of the Complaint.

90. Denied. Chase denies the allegations contained in paragraph 90 of the Complaint.

91. Denied. Chase denies the allegations contained in paragraph 91 of the Complaint.

**AS TO COUNT VI – INJUNCTION**

92. Chase incorporates its answers above as though more fully set forth herein at length.

93. Denied. Chase denies the allegations contained in paragraph 93 of the Complaint.

94. Denied. Chase denies the allegations contained in paragraph 94 of the Complaint.

***AFFIRMATIVE DEFENSES***

**FIRST AFFIRMATIVE DEFENSE**

Plaintiffs' Complaint fails to state a claim against Chase upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**

Plaintiffs' Complaint, and each cause of action or claim for relief in the Complaint, are barred by the terms of the Agreements between Chase and Plaintiffs.

**THIRD AFFIRMATIVE DEFENSE**

Plaintiffs' claims against Chase are barred by the applicable statute of limitations.

**FOURTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims against Chase are barred by the doctrine of laches.

**FIFTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims against Chase are barred by the doctrine of estoppel.

**SIXTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims against Chase are barred by the doctrine of waiver.

**SEVENTH AFFIRMATIVE DEFENSE**

Plaintiffs failed to mitigate their damages, if any, and therefore any recovery awarded to Plaintiffs against Chase should be barred or reduced by such amount.

**EIGHTH AFFIRMATIVE DEFENSE**

Plaintiffs' conduct relative to Chase is or was such as to bring the Plaintiffs into this lawsuit with unclean hands.

**NINTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims against Chase are barred by the Statute of Frauds.

**TENTH AFFIRMATIVE DEFENSE**

Plaintiffs' alleged damages, if any, were proximately caused by the conduct of parties other than First Horizon, and recovery is therefore barred or proportionately reduced accordingly.

**ELEVENTH AFFIRMATIVE DEFENSE**

If Plaintiffs' alleged damages were proximately caused by the conduct of more than one party, any recovery must be apportioned as to the fault of each.

**TWELFTH AFFIRMATIVE DEFENSE**

Plaintiffs ratified and confirmed in all respects the acts of Chase by accepting the benefits to Plaintiff accruing from such acts.

**THIRTEENTH AFFIRMATIVE DEFENSE**

All duties and obligations owed to Plaintiffs arising out of any and all agreements, representations and contracts made by or on behalf of Chase, if any there were duly performed, satisfied and discharged.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs failed to perform, satisfy and/or fulfill any and all duties and obligations owed toward Chase arising out of any and all agreements, representations and contracts entered with Chase.

**FIFTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs are contractually obligated to indemnify and defend Chase from and against any and all claims, causes of actions, damages, liabilities, losses, costs and expenses, including, but not limited to, all reasonable attorneys' fees, arising out of and to the extent incidental to the present cause of action.

**SIXTEENTH AFFIRMATIVE DEFENSE**

By contract or otherwise, Plaintiffs assumed the risk alleged in the each cause of action and claim for relief.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred because Plaintiffs have agreed to indemnify and hold harmless Chase for each cause of action and claim for relief.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to mitigate any claimed damages, injuries or losses.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiffs, plaintiffs' attorneys or agents, and/or other persons (other than this answering defendant), have lost, destroyed, misplaced, altered, modified, failed to preserve or otherwise acted so as to preclude Chase from gaining access to relevant and material evidence.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiffs' claims are subject to dismissal for failing to join indispensable parties.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Chase denies that Plaintiffs are entitled to recover punitive damages based on the allegations set forth in Plaintiffs' Complaint. Chase further states that the imposition of punitive damages violates the provisions of the due process clause, equal protection clause, excess fines clause and other clauses contained in the Constitutions of the United States, Pennsylvania and other states. Further, the correct burden of proof for the imposition of punitive damages is by "clear and convincing evidence" and/or "beyond a reasonable doubt." Any lesser standard violates the provisions of the due process clause of the Constitutions of the United States, California and other states.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

Chase is a national association subject to the laws of the United States of America. As such, Chase cannot be held liable under state laws which are inconsistent with or otherwise preempted by banking regulation.

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

Chase has, at all material times with respect to Plaintiffs in good faith, and complied fully with the Fair Credit Reporting Act, 15 U.S.C. § 1601, et seq. (hereinafter the "FCRA").

**TWENTY-FOURTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred as they failed to comply with the procedures set forth in 15 U.S.C. § 168li.

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

Chase complied with 15 U.S.C. § 1681i.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are preempted by 15 U.S.C. § 1681t and 15 U.S.C. § 1681h(e) as the state law claims are inconsistent with the FCRA.

***PRAYER***

WHEREFORE, Chase prays for judgment as follows:

1. That Plaintiff take nothing by reason of the Complaint on file in this matter;

2. That the Complaint be dismissed as to Chase with prejudice;

3. That Chase be awarded reasonable attorney's fees and costs of suit incurred in this matter according to applicable law; and

4. For such other and further relief as this Court may deem just and proper under the circumstances.

Respectfully submitted,

DUANE MORRIS LLP

/s/ Brett L. Messinger
By: Brett L. Messinger
30 South 17th Street
Philadelphia, PA 19103
Attorneys for Defendant JP Morgan Chase Bank, N.A.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRETT WEINSTEIN and DANA WEINSTEIN,

Plaintiffs,

v.

JPMORGAN CHASE/CHASE FINANCIAL,

Defendant.

CIVIL ACTION NO. 11-1836

**CERTIFICATE OF SERVICE**

I, Brett L. Messinger, hereby state that a true and correct copy of the within Answer is being filed electronically utilizing the ECF system and that the EFC system will automatically generate and send a Notice of Electronic Filing to all users associated with the case. If the ECF system indicates that counsel is being served electronically, such service will be deemed to comply with the ECF system. If the ECF system indicates that counsel is not a user of the ECF system, a true and correct copy of this filing will be delivered by United States first class mail, postage prepaid, to any such counsel:

/s/ Brett L. Messinger
Brett L. Messinger (63020)

DM1\2608223.1

# Exhibit B

DEC-17-2007 MON 09:34 AM AME ABSTRACT FAX No. 2153938818 P. 001

A. Settlement Statement

U.S. Department of Housing and Urban Development
OMB Approval No. 2502-0265 (expires 11/30/2009)

B. Type of Loan

| 1. [ ] FHA 2. [ ] FmHA 3. [ ] Conv. Unins. 4. [ ] VA 5. [ ] Conv. Ins. | 6. File Number AMEPA-3214 | 7. Loan Number 17527038 | 8. Mortgage Insurance Case Number |
|---|---|---|---|

C. Note: [illegible] — The Express Settlement System Printed 12/13/2007 at 15:16 RO8

D. NAME OF BORROWER: Brett D. Weinstein, Esq. and Dana M. Weinstein
ADDRESS: 705 West DeKalb Pike, King of Prussia, PA 19406

E. NAME OF SELLER: LeBoutillier Road Associates Acquisition Corporation
ADDRESS: 2701 Renaissance Blvd., 4th Floor, King of Prussia, PA 19406

F. NAME OF LENDER: JP Morgan Chase Bank, N.A.
ADDRESS: 118 Pheasant Run, Su 110, Newtown, PA 18940

G. PROPERTY ADDRESS: Unit 8 at Highgrove, ADD, Malvern, PA 19355
Planned Community

H. SETTLEMENT AGENT: AME Abstract, LLC, Tele: 215-513-0170, 425 Main Street, Harleysville, PA 19438
PLACE OF SETTLEMENT: 705 West DeKalb Pike, King of Prussia, PA 19406

I. SETTLEMENT DATE: 12/14/2007

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER | | 400. GROSS AMOUNT DUE TO SELLER | |
| 101. Contract sales price | 930,000.00 | 401. Contract sales price | 930,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 20,606.77 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes 12/14/07 to 12/31/07 | .33 | 406. City/town taxes 12/14/07 to 12/31/07 | .33 |
| 107. School Taxes 12/14/07 to 06/30/08 | 10.61 | 407. School Taxes 12/14/07 to 06/30/08 | 10.61 |
| 108. EDU Sewer Tap-In Fee | 3,478.00 | 408. EDU Sewer Tap-In Fee | 3,478.00 |
| 110. PECO Gas Tie-In fee | 13,500.00 | 410. PECO Gas tie-in fee | 13,500.00 |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 967,595.71 | 420. GROSS AMOUNT DUE TO SELLER | 946,988.94 |
| 200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER | 93,030.37 | 500. REDUCTIONS IN AMOUNT DUE TO SELLER | |
| 201. Deposit or earnest money | 93,000.00 | 501. Excess Deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 744,000.00 | 502. Settlement charges to seller (line 1400) | 74,288.63 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of First Mortgage Loan | |
| 205. | | 505. | |
| 206. | | 506. Partial Mortgage Release DNB First, NA | 621,000.00 |
| 207. | | 507. Partial Mortgage Release DNB First, NA | 67,500.00 |
| 208. | | 508. Rollback Taxes-Act 319 Breach AME Abstract of PA Escrow | 109,570.74 |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY/FOR BORROWER | 837,000.00 | 520. TOTAL REDUCTION AMOUNT DUE SELLER | 872,359.37 |
| 300. CASH AT SETTLEMENT FROM OR TO BORROWER | | 600. CASH AT SETTLEMENT TO OR FROM SELLER | |
| 301. Gross amount due from borrower (line 120) | 967,595.71 | 601. Gross amount due to seller (line 420) | 946,988.94 |
| 302. Less amounts paid by/for borrower (line 220) | 837,000.00 | 602. Less reduction amount due seller (line 520) | 872,359.37 |
| 303. CASH FROM BORROWER | $130,565.34 130,595.71 | 603. CASH TO SELLER | 74,619.57 |

[illegible fine print]

TIN 20-4282317 SELLER(S) SIGNATURE(S) [signature]

SELLER(S) NEW MAILING ADDRESS 2701 Renaissance Boulevard, 4th Floor King of Prussia, PA 19406

SELLER(S) PHONE NUMBER 610-337-5560

DEC-17-2007 MON 09:35 AM AME ABSTRACT FAX No. 2153938816 P. 002

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
File Number: AMEPA-3214
PAGE 2

**SETTLEMENT STATEMENT**

TitleExpress Settlement System Printed 12/13/2007 at 15:18 ROS

| L. SETTLEMENT CHARGES | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price $930,000.00 @ 6.010 = 55,600.00 | | |
| Division of commission (line 700) as follows: | | |
| 701. $ 16,275.00 to Prudential Fox & Roach, Realtors | | |
| 702. $ 23,250.00 to Prudential Fox & Roach, Realtors | | |
| $ 16,275.00 to OPO Brokerage Advisors, LP | | |
| 703. Commission paid at Settlement | | 55,800.00 |
| 800. ITEMS PAYABLE IN CONNECTION WITH LOAN | | |
| 801. Loan Origination Fee % | | |
| 802. Loan Discount % | | |
| 803. Appraisal Fee | | |
| 804. Credit Report | | |
| 805. Processing Fee to JP Morgan Chase Bank, N.A. LR | 300.00 | |
| 806. Underwriting Fee to JP Morgan Chase Bank, N.A. LR | 200.00 | |
| 807. Application Fee-Non Refund to JP Morgan Chase Bank, N.A. LR | 395.00 | |
| 808. Tax Service Fee-First Finance to First American Real Estate Tax Svc LR | 84.00 | |
| 809. Lender Subsidy to JP Morgan Chase Bank, N.A. LR | 500.00 | |
| 810. | | |
| 811. | | |
| 900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | |
| 901. Interest From 12/14/2007 to 01/01/2008 @$ 145.2300 /day 18 Days LR | 2,614.14 | |
| 902. Mortgage Insurance Premium for to | | |
| 903. Hazard Insurance Premium for to | | |
| 904. | | |
| 905. | | |
| 1000. RESERVES DEPOSITED WITH LENDER FOR | | |
| 1001. Hazard Insurance mo. @ $ /mo | | |
| 1002. Mortgage Insurance mo. @ $ /mo | | |
| 1003. City Property Tax mo. @ $ .60 /mo | | |
| 1004. County Property Tax mo. @ $ 1.34 /mo | | |
| 1005. Annual Assessments mo. @ $ 1.63 /mo | | |
| 1009. Aggregate Analysis Adjustment | 0.00 | 0.00 |
| 1100. TITLE CHARGES | | |
| 1101. Settlement or closing fee to AME Abstract of PA, LLC | 176.00 | |
| 1102. Abstract or title search | | |
| 1103. Title examination | | |
| 1104. Title insurance binder | | |
| 1105. Copy, Scan, Fax Fee to AME Abstract of PA, LLC | 100.00 | |
| 1106. Notary Fees to Roseanne O. McGrory | 26.00 | |
| 1107. Attorney's fees to McCartney, Mitchell & Campbell LLC | | 6,708.63 |
| (includes above items No: #1201 - 50% ) | | |
| 1108. Title insurance to AME Abstract, LLC | 4,024.13 | |
| (includes above items No: ) | | |
| 1109. Lender's Policy 744,000.00 - | | |
| 1110. Owner's Policy 930,000.00 - 4,024.13 | | |
| 1111. 100 Hs Vol. 300 Survey, 900 E to AME Abstract, LLC | 160.00 | |
| 1112. | | |
| 1113. Closing Svc Ltr to AME Abstract, LLC | 35.00 | |
| 1200. GOVERNMENT RECORDING AND TRANSFER CHARGES | | |
| 1201. Recording Fees Deed $ 58.50 ; Mortgage $ 130.50 ; Release $ | 189.00 | |
| 1202. City/County tax/stamps Deed $13,950.00 ; Mortgage $ | 6,975.00 | 6,975.00 |
| 1203. State Tax/stamps Deed $9,300.00 ; Mortgage $ | 4,650.00 | 4,650.00 |
| 1204. Seller's Mortgage Rec'd to AME Abstract of PA, LLC - Recording | 130.50 | |
| 1205. (2) Mtg Release Rec'd to AME Abstract of PA, LLC - Recording | | 67.00 |
| 1300. ADDITIONAL SETTLEMENT CHARGES | | |
| 1301. Initial Capital Contribution to Highgrove at Toad Hall Homeowners Assoc. | 950.00 | |
| 1302. Corporate Lien Cert to Susquehanna Title | 25.00 | 25.00 |
| 1303. Wire Fee to AME Abstract of PA, LLC | 25.00 | 75.00 |
| 1304. Courier to AME Abstract of PA, LLC | 60.00 | |
| 1305. | | |
| 1306. | | |
| 1307. | | |
| 1308. | | |
| 1400. TOTAL SETTLEMENT CHARGES (entered on lines 103, Section J and 502, Section K) | 20,608.77 | 74,293.63 |

HUD CERTIFICATION OF BUYER AND SELLER

[illegible]

[signature] Dana M. Weinstein

[signature]

[illegible]

[illegible]

12/14/07

# Exhibit C

17527368
1175273688
17527369

Pennsylvania **CONSTRUCTION LOAN AGREEMENT**

THIS CONSTRUCTION LOAN AGREEMENT ("Loan Agreement") is dated 09/29/08 and is between
BRETT B WEINSTEIN,
DANA M WEINSTEIN, HUSBAND & WIFE

who have a mailing address of
2623 CONDOR CIR, AUDUBON, PA 19403-
(collectively "Borrower"), and
JPMORGAN CHASE BANK, N.A.
("Lender"), and/or Lender's successors and assigns.

1. PURPOSE AND DEFINITIONS:

1.1. Purpose: This Loan Agreement sets forth the obligations of Lender and Borrower regarding a loan for the funding of disbursements for construction of a single-family residence (the "Improvements") on the Real Property. Borrower's obligation to repay Lender's advances under this Loan Agreement are set forth in a promissory note (the "Note") and secured by a security instrument, as defined below ("Security Instrument"), covering the Real Property and the Improvements.

1.2. Definitions: In addition to the terms defined elsewhere in this Loan Agreement, the following terms shall have the meanings indicated below:

"Completion Date" means 09/28/09, the date by which the construction of the Improvements must be completed.

"Construction Contract" means the construction contracts between the Borrower and Borrower's contractors providing for construction of the Improvements on the Property.

"Construction Cost Breakdown" means the construction cost breakdown or construction budget(s) submitted to Lender or its agent for review.

"Construction Fund" means an amount equal to the proceeds of the Loan plus Borrower's contribution at closing, and Borrower's contribution pursuant to Section 5.11 herein, if any, which amounts shall be credited to a construction account (the "Construction Fund") to fund subsequent Disbursements requested pursuant to Sections 6 and 9 of this Loan Agreement.

"Disbursement" means an advance of any portion of the Loan pursuant to the terms of this Loan Agreement.

"General Contractor" means MASTERPIECE HOMES

"Improvements" means the single family residence, which is Borrower's principal residence or second home, to be constructed on the Real Property in accordance with the Plans.

"Interest Reserve Fund" has the meaning given to such term in Section 4.1 of this Loan Agreement.

"Invested Capital Account" means the non-interest bearing account established and maintained by Borrower with Lender in connection with the Loan into which Lender will deposit any amounts that Borrower deposits with Lender, including amounts deposited pursuant to Section 11.1 of this Loan Agreement.

"Loan Documents" means this Loan Agreement, the Note and any addenda thereto, the Security Instrument and any addenda thereto, the Modification Agreement and any other documents evidencing and/or securing the Loan or the procedures related thereto.

"Note" means, either an Adjustable Rate Note or a Fixed Rate Note, as applicable, given by Borrower to Lender, as modified by a Construction Addendum to Fixed Rate or Adjustable Rate Note.

"Plans" means the final plans and specifications to construct the Improvements, submitted by Borrower or its agent in connection with obtaining such permits or approvals as may be necessary in order to construct the Improvements.

"Real Property" means the real property encumbered by the Security Instrument as more particularly described in the Security Instrument.

"Recordation" means the recording of the Security Instrument, in the appropriate records of the county in which the Real Property is located.

"Rollover Date" means 09/29/09 which is the date on which the permanent phase of your loan begins.

"Security Instrument" means a deed of trust, mortgage or security deed given by Borrower to trustee for the benefit of Lender or directly to Lender, as the case may be, as modified by an Adjustable Rate Rider, if applicable, and any addenda thereto.

"State" means the State of Pennsylvania

"Title Company" means LANDAMERICA LAWYERS TITLE 2812 EMERYWOOD PKWY STE 200 RICHMOND, VA 23294

2. LOAN: Borrower and Lender agree that upon the closing of the Loan ("Closing") and the satisfaction of all conditions in the commitment letter given by Lender to Borrower for this Loan, Lender shall make the Loan to Borrower and Borrower shall accept the Loan upon the terms, conditions, covenants, provisions, representations, and warranties contained in this Loan Agreement and any other Loan Documents. All Disbursements under this Loan Agreement shall be evidenced by the Note, bear interest at the rate specified in the Note, and be secured by the Security Instrument and any other security agreements required by Lender. Borrower acknowledges and agrees that Lender's acceptance of this Loan Agreement does not constitute either an approval of any covenants, conditions and/or restrictions affecting the Property or a representation that the Improvements conform to any existing covenants, conditions and/or restrictions.

2.1. Interest Draws: Disbursements on account of interest on the Loan shall be made directly by Lender to itself on the due date set forth in the Note, without any prior notice to Borrower; provided that the Construction Cost Breakdown provides for an interest reserve and has funds available. Lender shall provide Borrower with a monthly notice setting forth the amount of interest so paid. In the event that an interest reserve is not provided for, or funds are no longer available, Borrower will be responsible for paying interest on the Note to Lender and, if requested by Lender, for modifying the Construction Cost Breakdown in accordance with this Loan Agreement to provide sufficient funds for interest payments.

3. LOAN PROCEEDS: At Closing, Lender is authorized to make the initial Disbursement (the "Initial Disbursement") at the direction of Borrower in the manner and for the purposes provided by Section 4 of this Loan Agreement. Subsequent Disbursements will be made subject to Borrower satisfying Borrower's obligations set forth in this Loan Agreement.

4. INITIAL DISBURSEMENT: Lender shall make the Initial Disbursement for the purposes and to the parties set forth in the HUD 1 Settlement Statement provided to Borrower.

4.1 _____ If an "X" has been placed in the space immediately preceding this sentence, an interest reserve fund (the "Interest Reserve Fund") has been established by Lender for this Loan as specified on a rider entitled "Interest Reserve Fund Rider" which is attached to this Loan Agreement. The amount specified on that rider shall be credited to an account established by Lender for the payment of interest under the Note pursuant to the rider.

4.2. An amount equal to all remaining proceeds of the Loan following the Initial Disbursement shall be credited to the Construction Fund to fund subsequent Disbursements requested pursuant to Sections 6, 8 and 9 of this Loan Agreement.

5. CONDITIONS PRECEDENT TO DISBURSEMENTS: As a prior condition to making each Disbursement against the Construction Fund, except for the Final Disbursement, it is Borrower's duty, and not Lender's, to ensure that each of the following conditions shall have been satisfied:

5.1. Plans and Specifications: The Plans, the Construction Cost Breakdown and other related documents shall have been submitted for review by Lender.

5.2. Draw Requests: Borrower shall have submitted and Lender shall have approved a draw request in a form required by Lender (the "Draw Request") signed by both Borrower and the General Contractor for each Disbursement requested. The Draw Request shall be submitted to Lender at least seven (7) days prior to the requested Disbursement. No more than one (1) Draw Request shall be submitted during any calendar month. If Borrower executes a "Delegation of Authority" or its equivalent, whereby Borrower delegates to the General Contractor authority to be sole signatory to Draw Requests, such Delegation of Authority is hereby incorporated into this Loan Agreement.

5.3. Notice from Inspector: Lender shall have received notice from the inspector hired for the sole purpose of protecting Lender's collateral, and to provide information to Lender regarding the percentage completion of the Improvements.

5.4. Title Insurance and Survey: Should Lender so request, an insurer not objectionable to Lender ("Title Company") shall have issued or notified Lender that the Title Company shall issue a construction loan endorsement to its insurance policy, which endorsement shall disclose no exceptions to title other than those listed in Schedule B of the title insurance policy originally received by Lender for the Loan, or as subsequently disclosed to and approved by Lender in writing. Additionally, should Lender so request, Borrower shall have delivered to Lender and the Title Company a survey acceptable to both Lender and the Title Company and meeting the minimum technical requirements of surveys in the State.

5.5. No Defaults: No Event of Default, as defined in Section 12 of this Loan Agreement, exists or is continuing and there are no events continuing under any of the Loan Documents which with notice from Lender and/or the passage of time would become an Event of Default.

5.6. Representations, Warranties and Covenants: The representations, warranties and covenants of Borrower made in Sections 10 and 11 of this Loan Agreement shall have been satisfied and shall be true and correct in all material respects on and as of the date of each Disbursement hereunder with the same effect as if made on the date of the applicable Disbursement.

5.7. Construction: The Improvements are being constructed timely and erected entirely within the boundaries of the Real Property in strict compliance with all applicable laws, ordinances, plats, restrictions or matters of record, in a good and workmanlike manner and free from mechanic's liens, with materials and workmanship of the highest quality, and in strict accordance with the Plans. Borrower shall hold Lender harmless from and against any and all matters that relate to the construction of the Improvements on the Real Property.

5.8. Defect Corrections: Any defect(s) in the Improvements have been promptly rectified by Borrower. Borrower shall ensure that there are not any material deviation(s) from the Plans not approved in writing and in advance by Lender. Disbursements made during the existence of any defect or unapproved deviation from the Plans shall not constitute a waiver of Lender's right to require compliance with Borrower's duties set forth herein and Borrower hereby holds Lender harmless for any such defect or unapproved deviation.

5.9. No Damage or Destruction: None of the completed Improvements shall have been adversely affected and/or damaged by fire and/or other casualty unless (i) there are insurance proceeds and/or (ii) there are Borrower's funds available, together with such insurance proceeds, sufficient in Lender's sole, absolute and arbitrary discretion to effect the satisfactory restoration of the injured and/or damaged Improvements and to permit the completion thereof within a reasonable time pursuant to the Plans.

5.10. Amount of Disbursements: The aggregate amount of all previous Disbursements under this Loan Agreement plus the amount then currently requested does not exceed the lesser of (a) the value of labor and materials expended for and physically incorporated into the Improvements through the date of the then currently requested Disbursement as approved by Lender, or (b) the amount allocated by Lender to the stage of completion of the Improvements as of the date of the then currently requested disbursement.

5.11. Limit on Disbursement: The then currently requested Disbursement shall not reduce the Construction Fund to an amount below the amount needed to pay for the labor and materials that, in Lender's sole, absolute and arbitrary judgment, is necessary to complete the Improvements according to the Plans. Disbursements to fund overhead line items shall be made in proportion to the percentage to which the Improvements have been completed in accordance with the budget, as conclusively determined by Lender in its sole, absolute and arbitrary discretion. If at any time Lender determines that the amount remaining in the Construction Fund is not sufficient to complete the construction of the Improvements, Borrower shall promptly deposit such amount as Lender in its sole, absolute and arbitrary judgment believes is necessary to increase the amount of the Construction Fund so that it is sufficient to complete construction of the Improvements.

5.12. Lien Releases: Borrower shall have provided, or caused the General Contractor to provide, to Lender and/or the Title Company, upon the request of Lender all affidavits of payment, final lien releases, unconditional construction disclaimers, lien waivers, and general releases and such other documentation as Lender or the Title Company may require (collectively "Lien Releases"). Borrower recognizes that it is Lender's policy and practice that, in its sole, absolute and arbitrary discretion, Lender may not require that Lien Releases or the like be obtained. Should Lender not require any Lien Releases or evidence of use of the Loan proceeds, it is Borrower's duty to obtain any such Lien Releases should Borrower deem it appropriate or necessary and hereby holds Lender harmless therefor. Borrower acknowledges and agrees that should Lender not request that Borrower provide Lien Releases, Borrower may independently obtain Lien Releases and should Borrower desire such information it is Borrower's duty to obtain same.

5.13. Foundation Survey: If required by Lender in Lender's sole, absolute and arbitrary discretion, Borrower shall cause a foundation survey to be made and delivered to Lender for the foundation prior to the commencement of framing on the foundation.

5.14. Compliance with Soils Report: If required by Lender, in Lender's sole, absolute and arbitrary discretion, Lender shall have received evidence that Borrower has complied with all of the recommendations of the engineer under any soils report received by Borrower and/or the General Contractor for the Real Property.

5.15. Stop Notices: If applicable law grants contractors, subcontractors or materialmen the right to file a claim directly against Lender for a portion of the Loan amount, sometimes called a "Stop Notice" or "Withhold Notice" or the like, which notice requires Lender to withhold and not disburse a portion of the Loan proceeds, then Lender shall have the right to require Borrower to do either of the following: (i) provide any bond(s) permitted by applicable law which then enable Lender to disburse the funds affected by the claim or (ii) deposit into the Construction Fund, within five (5) days after demand by Lender, funds sufficient to pay the amount demanded in the claim.

6. CONSTRUCTION FUND DISBURSEMENT: Upon Borrower's satisfaction of all of the conditions under Section 5 of this Loan Agreement, Lender shall disburse such sums as requested in the Draw Request or such sums as in Lender's sole, absolute and arbitrary discretion are warranted under the circumstances, under the following conditions:

6.1. Disbursement First from Borrower's Funds: All amounts held by Lender in the Invested Capital Account

from time to time shall be disbursed prior to any Disbursement from the Construction Fund. All amounts disbursed from either the Invested Capital Account or the Construction Fund shall be used solely for the payment of the cost of the Improvements as specified on the appropriate Draw Request.

6.2. Disbursement Against Promissory Note and Construction Fund: Each Disbursement shall be made against the Note and the Construction Fund by increasing the amount of the outstanding principal under the Note to the extent Loan proceeds are used. The available amount remaining for Disbursement under the Construction Fund will be reduced by the amount of any Disbursement against the Construction Fund.

6.3. Construction Fees: At Lender's request, Borrower shall reimburse Lender for all, or a portion, of the fees and costs incurred by Lender in connection with the construction of the Improvements on the Real Property, including: (i) costs incurred in connection with periodic disbursement of loan proceeds during the construction period; (ii) costs incurred by Lender in inspecting its collateral during the construction period; and (iii) such other costs as may be necessarily and reasonably incurred by Lender in connection with the construction of the Improvements.

6.4. Interest Reserve Fund: _____ If an "X" appears in the space immediately preceding this sentence, a portion of the Loan proceeds have been allocated for the payment of interest from the Interest Reserve Fund as interest becomes due under the Note. The provisions for the Interest Reserve Fund are contained on a rider attached to this Loan Agreement.

If the space does not have an "X", there is no Interest Reserve Fund, and Borrower shall pay interest under the Note as interest becomes due and payable.

7. EFFECT OF SIGNING DRAW REQUESTS: By executing a Draw Request, Borrower (i) is representing that Borrower has inspected the Improvements and certifies that the Improvements are consistent with the Plans; (ii) is representing that the Improvements are satisfactory in all respects to Borrower; (iii) is representing to Lender that the percentage completion of the Improvements is equal to, or greater than, the percentage of the Construction Fund that has been disbursed; and (iv) releases Lender from any and all claims, losses, liability, damages, and expenses relating to the Loan, the Real Property, or the Improvements that are attributable to acts or omissions occurring before the date Borrower executes the Draw Request and holds Lender harmless for any of Lender's and Lender's agents' activities in connection with the Loan or the construction of the Improvements.

7.1. Multiple Borrowers: If Borrower is more than one person or entity, then either or any of them are authorized to approve disbursements on behalf of Borrower; provided however, that if Lender receives conflicting instructions, Lender shall be under no obligation to disburse the Loan until such time as Lender receives consistent instructions and authorizations.

8. CONDITIONS PRECEDENT TO FINAL DISBURSEMENT: Prior to Lender making the final Disbursement against the Construction Fund (the "Final Disbursement"), Borrower shall have the duty to ensure that all of the following conditions shall have been satisfied:

8.1. Sections 5, 10 and 11 Conditions Satisfied: All conditions, representations, warranties and/or covenants set forth in Sections 5, 10 and 11 of this Loan Agreement shall have been satisfied.

8.2. Completion of Improvements: The Improvements shall have been completed in accordance with the Plans. Additionally, Borrower shall deliver to Lender a copy of the certificate of occupancy or local equivalent issued by the governmental authority(ies) having jurisdiction over the Real Property.

8.3. Current Survey: If required by Lender, in Lender's sole, absolute and arbitrary discretion, Borrower shall provide Lender with a current as-built survey of the Real Property and the Improvements, including dimensions, delineations and locations of all completed Improvements thereon and all easements or other rights or restrictions thereon, certified to Lender by the surveyor and satisfactory to Lender and the Title Company.

8.4. Lender's Final ALTA Title Commitment and Policy: Lender shall have received from the Title Company a commitment to provide an endorsement to the title policy insuring Lender to the full amount of the Loan disbursed, which endorsement shall disclose no exceptions to title other than those listed in Schedule B of the title insurance policy originally received by Lender, or as subsequently approved by Lender in writing. The commitment to provide the endorsement shall delete any exception for pending disbursements and mechanics and materialmen's liens. In addition, Lender also shall have received such additional endorsements containing such additional assurances as Lender may require. The Title Company shall provide promptly the Title Policy to which it has committed as set forth herein.

8.5. Affidavits and Lien Releases: If required by Lender, in Lender's sole, absolute and arbitrary discretion Lender and the Title Company shall have been provided all affidavits and final Lien Releases from Borrower, the General Contractor, any other contractor and any other third party, all as requested by and in a form satisfactory to Lender.

9. FINAL DISBURSEMENT: Upon full satisfaction of all conditions under Section 8 of this Loan Agreement, Lender shall disburse the remaining undisbursed balance of the Loan.

10. REPRESENTATIONS AND WARRANTIES OF BORROWER: Borrower represents and warrants to Lender that:

10.1.   Plans:  The Plans are satisfactory to Borrower and any governmental authority having jurisdiction over the Real Property.  The Plans do not violate any of the conditions, covenants and restrictions on the Real Property.

10.2.   Construction:  No demolition, excavation or construction has been started on and no materials or supplies have been delivered to the Real Property as of the date of Recordation.

10.3.   General Contractor:  General Contractor has all licenses, permits and approvals required to conduct business as a general contractor in the state and municipality in which the Real Property is located.  Borrower shall not execute any contract or become a party to any arrangement for the performance of any work on the Property except for the Construction Contracts.

10.3.1  Termination of General Contractor:  Should Borrower terminate the General Contractor, Borrower shall immediately notify Lender and follow Lender's procedures for implementing a replacement contractor, including submission of a Contractor's Questionnaire for each proposed replacement contractor.  A replacement contractor review fee of $750 shall be paid by Borrower in connection with each subsequent general contractor submitted to Lender for review.

10.3.2  List of Subcontractors:  If requested by Lender, Borrower shall deliver to Lender, or cause General Contractor to deliver to Lender, the names of all persons with whom the General Contractor has contracted or intends to contract for the construction of the Improvements or for the furnishing of labor or materials to the Real Property.

10.3.3  Invoices:  Upon written request by Lender, Borrower shall deliver to Lender, or cause General Contractor to deliver to Lender, all contracts, bills of sale, statements, receipted vouchers or agreements under which Borrower claims title to any materials, fixtures, or articles incorporated in the Improvements.

10.4.   No Untrue Statements or Material Omissions:  There are no statements, representations, or warranties contained in this Loan Agreement or in any certificate or other document furnished by Borrower pursuant to this Loan Agreement that contain any untrue statement of any material fact or omit any material fact.

10.5.   Consents and Approvals Obtained:  Borrower has obtained all permits, consents, approvals, and authorizations of, and made all filings, registrations, and qualifications with, any governmental authority or other third party required under this Loan Agreement or necessary to construct the Improvements.  Borrower has also performed all undertakings and obligations required under this Loan Agreement and for the construction of the Improvements.

10.6.   Litigation:  There are no actions, suits or proceedings pending, or threatened against or affecting Borrower or the Real Property.  Borrower is not in default with respect to any order, writ, injunction, decree, or demand of any court or governmental authority.

10.7.   No Breach:  This Loan Agreement, the Note and the Security Instrument will not result in any breach of, or constitute a default under any deed of trust, mortgage, security instrument, lease, bank loan, security agreement, or other instrument to which Borrower is a party or by which Borrower may be bound or affected.

10.8.   Utilities and Easements:  All utility services necessary for the construction and operation of the Improvements are available at, or within, the boundaries of the Real Property, including without limitation, water supply, storm and sanitary sewer facilities, gas electric and telephone facilities.  In addition, all such easements as are necessary to preserve the value of the Real Property as a residence, including easements for utilities and ingress and egress to the Real Property, have been properly granted and recorded.

10.9.   Draw Request:  Each Draw Request will be true and accurate upon its submission to Lender.  The submission of each Draw Request to Lender shall constitute a reaffirmation of the accuracy of the representations and warranties and Borrower's compliance with the covenants contained in this Loan Agreement.

10.10.  Other Contracts:  Except for the Construction Contracts, Borrower has not made any contracts or arrangements of any kind for the construction of the Improvements, without the prior written approval of Lender.

10.11.  No Default:  There are no defaults continuing under any of the Loan Documents, and no events have occurred which, with notice from Lender and/or the passage of time, would constitute a default under any of the Loan Documents.

10.12.  Compliance With Laws, Rules, Etc.:  The Improvements will in all respects conform to, and comply with, all covenants, conditions, restrictions, reservations and zoning ordinances affecting the Real Property.  No covenants, declarations or restrictions affecting the Real Property are or will be superior to the lien of the Security Instrument, unless the written consent of Lender is first obtained.

10.13.  Other Financing:  Borrower has not received any other financing for the acquisition of the Real Property and/or the construction and installation of the Improvements.

10.14.  Access:  All access to and from the Real Property is unencumbered and reasonably suitable for (i) the

construction of the Improvements, and (ii) the intended occupancy, operation and use of the Improvements as a single family residence.

10.15. Flood Areas: No portion of the Real Property on which Improvements are or will be located lies within any flood prone area or has been designated by governmental authority as being within the 100-year flood plain; unless Lender has been notified of any flood prone area or 100-year flood plain and flood insurance satisfactory to Lender has been obtained.

11. BORROWER'S COVENANTS: Unless Lender waives compliance in writing and until the Loan is paid in full:

11.1. Borrower's Funds: Borrower shall, upon demand from Lender, immediately deposit with Lender any deficiency should it appear at any time that the Construction Fund is insufficient, in Lender's sole, absolute and arbitrary judgment, to complete construction of the Improvements according to the Plans. All such deposits shall be held by Lender in the Invested Capital Account and shall be disbursed to Borrower or, at the option of Lender, to the General Contractor, for construction of the Improvements prior to any Disbursement of proceeds of the Loan. Borrower shall not use any funds other than Disbursements against the Construction Fund to make any Improvements to the Real Property without Lender's prior written consent, and Lender receives such assurances, as Lender deems necessary, that any such Improvements shall be completed lien free.

11.2. Change Orders: All changes to the Plans, whether structural or non-structural and whether or not such changes require the prior approval of Lender, or increases in the total amount of the Construction Cost Breakdown, shall be documented in writing as a change order and shall be delivered to Lender with appropriate backup documentation. All change orders shall require the prior written approval of Lender or Lender's agent. No such approval shall render Lender or Lender's agent responsible for any defect or deficiency in any such change order, it being intended that the right of Lender or Lender's agent to review change-orders shall be for Lender's sole protection and benefit.

11.3. Inspection: Lender, its agents or Lender's other designated representative(s), shall have the right, but not the obligation, to enter upon the Real Property without notice to inspect the Improvements and all materials to be used in the construction of the Improvements. Lender, its agents or Lender's other designated representative(s), also shall have the right, but not the obligation, to examine (i) the Plans including shop drawings used in constructing the Improvements; (ii) the Construction Contracts, any subcontracts, and any records of payments by or for the account of Borrower with respect thereto; and (iii) any other documents in the possession of or under the control of Borrower pertaining to the Real Property or the Improvements. Borrower shall cooperate, and shall cause the General Contractor to cooperate, with Lender in carrying out the intent of this Section and shall cause the General Contractor to require the subcontractors to cooperate with Lender in carrying out the intent of this Section.

11.3.1 INSPECTIONS BY LENDER SHALL BE SOLELY FOR THE PURPOSE OF PROTECTING THE SECURITY FOR THE LOAN AND FOR THE LENDER'S BENEFIT ONLY. BORROWER, THE GENERAL CONTRACTOR, SUBCONTRACTORS, AND SUPPLIERS SHALL NOT RELY ON LENDER'S INSPECTIONS FOR ANY PURPOSE AND HEREBY WAIVE ANY AND ALL CLAIMS AGAINST LENDER, ITS AGENTS, AND OTHER DESIGNATED REPRESENTATIVE(S) RELATING TO, OR ARISING FROM, SUCH INSPECTIONS. ESTIMATES OF PERCENTAGE OF COMPLETION AS CONTEMPLATED IN THIS LOAN AGREEMENT ARE PERFORMED SOLELY FOR LENDER'S BENEFIT, AND LENDER, ITS AGENTS AND OTHER DESIGNATED REPRESENTATIVE(S) ARE HEREBY HELD HARMLESS AND SHALL HAVE NO LIABILITY TO BORROWER, THE GENERAL CONTRACTOR, SUBCONTRACTORS, SUPPLIERS, OR ANY OTHER THIRD PARTY IF SUCH ESTIMATES ARE INCORRECT. BORROWER, THE GENERAL CONTRACTOR, SUBCONTRACTORS, AND SUPPLIERS MAY ENGAGE THEIR OWN INSPECTOR(S) DURING THE COURSE OF THE CONSTRUCTION OF THE IMPROVEMENTS. LENDER IS THE ONLY INTENDED BENEFICIARY OF ANY AGREEMENT BETWEEN LENDER, ITS AGENTS OR OTHER DESIGNATED REPRESENTATIVE(S). LENDER'S AGENTS AND OTHER DESIGNATED REPRESENTATIVES ARE INTENDED BENEFICIARIES OF THIS SECTION OF THIS LOAN AGREEMENT.

11.4. Deviations from Construction Contract: If any labor or materials used in construction of any part of the Improvements would materially impair the construction of the Improvements according to the Plans in the reasonable judgment of Borrower, the General Contractor, or any third party, or if the Construction Contracts have not been complied with in any material respect, Borrower shall immediately notify Lender in writing and remedy the deviation. In addition, if Lender determines in its sole, absolute and arbitrary discretion that unsatisfactory work or materials have been incorporated into the Improvements, Borrower does not object to Lender withholding all payments from the Construction Fund until such work or materials is satisfactory to Lender.

11.5. Title Insurance: Borrower shall pay for an ALTA extended coverage Lender's policy of title insurance in form and substance satisfactory to Lender, issued by the Title Company, together with such title insurance endorsements to Lender's policy of insurance as Lender may require, at the initial closing and as a condition to each subsequent disbursement, including any endorsements insuring the priority of the Security Instrument over any and all liens (including, without limitation, mechanics' liens). Without limiting the foregoing, if required by Lender, Borrower shall provide to Lender, and pay for, an endorsement upon the completion of the first floor foundation. Upon completion of the Improvements, Borrower shall pay for whatever further endorsements or title insurance policy Lender may require, including but not limited to those showing that the Improvements have been constructed within the boundaries of the Real Property with no mechanics' liens and in accordance with all applicable laws, covenants and restrictions, and deliver an indemnity agreement respecting lien claims to the Title Company, if required to enable it to issue any such endorsements or title insurance policy.

11.6. Construction Contracts: Borrower shall not execute any contract or become a party to any arrangement

for the performance of any work on the Real Property except for the Construction Contracts.

11.7. Insurance: Borrower shall maintain the following policies of insurance in form, content, and amounts required by Lender from insurers with a current Best's Key Rating Guide rating of Class 8 or better, including without limitation a clause giving Lender a minimum of thirty (30) days notice prior to cancellation:

11.7.1 Hazard and Builder's Risk: "All-risk" Builder's Risk insurance without co-insurance in an amount which is equal to or greater than one hundred percent (100%) of the replacement cost of the Improvements, with the standard conditions. The policy term must be coterminous with the applicable construction period and any extensions thereof, and upon completion of the Improvements, the policy must be converted to a standard hazard insurance policy. Such policy must also contain a Lender's Loss Payable Endorsement, satisfactory to Lender and completed as follows:

JPMORGAN CHASE BANK, N.A., Its Successors and/or Assigns, ATIMA
P.O. Box 979274, Miami, FL 33197

11.7.2 Worker's Compensation: Worker's compensation insurance as required by applicable law.

11.7.3 Flood: Flood insurance if any portion of the Real Property is situated in a flood-prone area as designated by an appropriate governmental entity.

11.8. Taxes: Borrower shall pay and discharge all lawful claims, including taxes, assessments, and governmental charges or levies imposed upon Borrower or Borrower's income or profits, or upon any properties belonging to Borrower prior to the due date thereof, provided, however, Borrower shall not be required to pay any such tax, assessment charge or levy, the payment of which is being contested in good faith and by proper proceedings and further provided that adequate reserves have been established for the payment of same.

11.9. Compliance with Governmental Requirements: Borrower shall comply promptly with the requirements of all governmental authorities having jurisdiction over the Real Property, subject to the right of Borrower to contest the same by legally permissible procedures. Borrower shall promptly deliver to Lender, a copy of all communications from and/or to any governmental authority as received and/or sent by Borrower in connection with any violation of applicable law relating to the Real Property.

11.10. Lender's Reliance: Lender may assume that the statements, facts, information and representations contained in any documents, affidavits, orders, receipts, or other written instruments filed with Lender by Borrower, or on behalf of Borrower, or exhibited to Lender by Borrower, or on behalf of Borrower, with respect to the Loan and/or the construction of the Improvements, are true and correct, and Lender does not have any obligation of investigation or inquiry. Any Disbursement by Lender in reliance on the foregoing shall be conclusively deemed made in discharge of Lender's obligations under this Loan Agreement to the extent of all amounts so paid.

11.11. Application of Disbursements: Borrower and/or the General Contractor shall receive all Disbursements under this Loan Agreement in trust for the purpose of paying for the costs of construction of the Improvements as specified on the Construction Cost Breakdown and the appropriate Draw Request.

11.12. Approvals: Borrower shall obtain and deliver to Lender evidence of all approvals by all governmental authorities having jurisdiction over the Real Property for the permanent occupancy of the Improvements if such approvals are a condition of the lawful use and occupancy of the Improvements.

11.13. Paid Vouchers: Borrower shall deliver, or cause the General Contractor to deliver, to Lender, upon demand, any contracts, bills of sale, statements, receipted vouchers or agreements under which Borrower claims title to any materials, fixtures, or articles incorporated in the Improvements or subject to the lien of Lender.

11.14. Defect Corrections: Borrower shall cause the correction of any defect in the Improvements or any material deviation from the Plans, not approved by Lender. The Disbursement of Loan proceeds during the continuation of any defect shall not constitute a waiver of Lender's right to require compliance with this covenant with respect to any such defects or departures from the Plans not previously discovered and approved by Lender.

11.15. Construction: Within thirty (30) days from the date of this Loan Agreement, Borrower shall cause the General Contractor to commence construction of the Improvements and to diligently pursue the completion of Improvements so that the completion of Improvements occurs on or before the Completion Date. For purpose of this Section, the Improvements shall be deemed completed upon the satisfaction of the conditions set forth in Section 8.2 hereof.

11.16. Environmental Provision: Borrower will not cause or permit any hazardous or toxic material to be used, placed or disposed of on or about the Real Property, or any contiguous real estate, in violation of any applicable law or regulation. Borrower shall promptly notify Lender in the event of any use, placement, or disposal of any hazardous and/or toxic material on or about the Real Property in violation of any applicable law or regulation. If requested by Lender, Borrower, at Borrower's expense, shall cause Lender to receive an environmental site assessment or environmental audit report, or any update of such assessment or report, in scope, form, and content satisfactory to Lender.

Borrower shall indemnify and hold Lender harmless from and against all loss, liability, damage, and expense,

including attorneys' fees and costs, suffered or incurred by Lender as a result of any toxic or hazardous substance on the Real Property, violation of any applicable environmental laws or regulations to the Real Property prior to or during the ownership of the Real Property by Borrower, including without limitation any loss of value of the Real Property. This indemnity and hold harmless provision shall survive any acquisition of title to the Real Property by Lender.

11.17. No Assumed Duties: No act by Lender of any kind or nature whatsoever shall result in Lender assuming any duty(ies) in connection with the Loan or the construction of the Improvements on the Real Property not expressly set forth in this Loan Agreement.

11.18. NO FIDUCIARY DUTIES: THE PARTIES HEREBY DISCLAIM ANY FIDUCIARY OR CONFIDENTIAL RELATIONSHIP AND AGREE THAT LENDER WILL NOT HAVE ANY FIDUCIARY DUTIES TO BORROWER OR ANY THIRD PARTIES ARISING OUT OF THIS LOAN AGREEMENT, THE PARTIES' RELATIONSHIP, OR ANY ACTIVITIES CONTEMPLATED BY THIS LOAN AGREEMENT. IN ADDITION, IN PARTIAL CONSIDERATION FOR LENDER'S AGREEMENT TO MAKE THE LOAN, BORROWER HEREBY WAIVES ANY AND ALL RIGHT TO BRING ANY CAUSE OF ACTION AGAINST LENDER FOR BREACH OF ANY ALLEGED FIDUCIARY DUTY.

11.19. BORROWER'S SELECTION OF GENERAL CONTRACTOR AND PROFESSIONALS: IT IS UNDERSTOOD AND AGREED THAT THE GENERAL CONTRACTOR(S), ARCHITECT, ENGINEERS AND/OR ANY OTHER PROFESSIONAL OR CONSULTANT HAVE BEEN SELECTED BY BORROWER AFTER BORROWER'S INDEPENDENT INVESTIGATION AND DECISION AND NOT IN RELIANCE UPON ANY REPRESENTATION BY LENDER. LENDER IS NOT LIABLE FOR THE BORROWER'S SELECTION, OR THE WORK OR NEGLIGENT, FRAUDULENT, OR INTENTIONAL ACTS OR OMISSIONS OF THE GENERAL CONTRACTOR(S), ARCHITECT, ENGINEERS, OR ANY OTHER PROFESSIONAL OR CONSULTANT, OR THE WORK OR NEGLIGENT, FRAUDULENT, OR INTENTIONAL ACTS OR OMISSIONS OF ANY SUBCONTRACTOR OR MATERIAL SUPPLIER THEREOF.

12. EVENTS OF DEFAULT: The following shall constitute an "Event of Default" or "Events of Default" under this Loan Agreement.

12.1. Maturity Date: Any failure to pay, on the maturity date specified in the Note, all amounts then due under the Loan Documents.

12.2. Note Payments: Any failure to pay scheduled monthly payments of principal and/or interest under the Note on or before the expiration of any applicable grace period, including without limitation, interest payments for which there are insufficient funds in the Interest Reserve Fund (if applicable).

12.3. Other Payments: Any default in the payment of any other sums as required to be paid under the Note, the Security Instrument, this Loan Agreement or any of the Loan Documents and which are not paid within any applicable grace period.

12.4. Default Under This Loan Agreement: Except as specifically provided elsewhere in this Section 12, any default under this Loan Agreement, including any non-monetary default, which is not cured within thirty (30) days following receipt of notice from Lender, or in the case of a default not susceptible to cure within such time, if Borrower does not commence and diligently complete the cure within a reasonable time under the circumstances, following receipt of notice from Lender. A default under this Loan Agreement shall occur when any representation or warranty set forth herein is not true, accurate or honored or when Borrower fails to comply with Borrower's obligations to satisfy each of the covenants or obligations set forth in this Loan Agreement.

12.5. Non-Monetary Defaults Under Other Loan Documents: Any non-monetary default under the Note, the Security Instrument, or any other Loan Documents (excluding this Loan Agreement), which is not cured within any applicable grace period, if any.

12.6. Attachment, Execution, or Judicial Seizure: Any attachment, execution, or other judicial seizure of any portion of Borrower's assets and such seizure is not discharged within sixty (60) days, unless Lender determines in its sole, absolute and arbitrary discretion that such seizure will be discharged, in which case the time limit will be extended to one hundred twenty (120) days.

12.7. Insolvency: Borrower becomes insolvent or unable to pay its debts as they mature, or Borrower makes an assignment for the benefit of its creditors.

12.8. Bankruptcy: Borrower files or there is filed against Borrower a petition to have Borrower adjudicated bankrupt, or a petition for reorganization or arrangement under any law relating to bankruptcy unless in the case of a petition filed against Borrower, the petition is dismissed within sixty (60) days following the filing or Borrower gives Lender reasonable assurances that Borrower is and will be able to pay its financial obligations when due and the petition will be dismissed within a reasonable time.

12.9. Receiver, Trustee or Conservator: Borrower applies for or consents to the appointment of a receiver, trustee, or conservator for any portion of Borrower's property or such appointment is made without Borrower's consent and is not vacated within sixty (60) days, unless Lender determines in its sole, absolute and arbitrary discretion that it will be vacated, in which case the time limit will be extended to one hundred and twenty (120) days.

12.10. Misrepresentations: Any representation of Borrower or omission by Borrower of any material fact which proves to be false or misleading and which is or shall be relied upon by Lender in making the Loan and/or disbursing the Loan proceeds under this Loan Agreement.

12.11. Injunction Against Construction: Any court of competent jurisdiction issues an order or decree enjoining the construction of the Improvements, or enjoining, or prohibiting the performance of this Loan Agreement, and any such decree or order is not vacated within fifteen (15) days after it is issued, unless Borrower gives reasonable assurances to Lender that such decree or order will be vacated, in which case the time limit will be extended to forty-five (45) days.

12.12. Failure to Maintain Permits: Borrower neglects, fails, or refuses to keep in full force and effect any permit or approval necessary for the construction and occupancy of the Improvements.

12.13. Encumbrances: The imposition of any voluntary or involuntary lien, claim or encumbrance upon or against the Real Property and/or Improvements and/or any of the Loan proceeds, except as permitted by the Security Instrument or approved by Lender, unless (i) a bond or other security acceptable to Lender is provided within thirty (30) days following written notice to Borrower of such lien, or (ii) such lien is released within thirty (30) days of the imposition of such lien.

12.14. Abandonment of Construction: Borrower ceases or abandons construction of the Improvements, for any reason, for fifteen (15) consecutive days, unless the delay or abandonment is caused by circumstances beyond the control of Borrower and/or the General Contractor, in which case, the cessation or abandonment may continue for up to sixty (60) consecutive days, provided Borrower diligently undertakes to do everything reasonably necessary to continue construction of the Improvements.

12.15. Timely Completion of Construction: For any reason, the Improvements are not completed prior to the Completion Date or any written extensions thereof and, if required by the municipality where the Improvements are located, a final certificate of occupancy or local equivalent is not issued and a copy thereof is not delivered to Lender, on or before the Completion Date (or any written agreement by Lender to extend the Completion Date). Borrower agrees hereby that a delay in the completion of the construction of the Improvements shall necessarily impair the value of Improvements and shall entitle Lender to exercise any and all remedies as may be available, including foreclosure.

12.16. Failure to Respond to Lender or Provide Information: Borrower fails to respond, in writing, to three written inquiries by Lender, or its agent, regarding any matter relating to the Loan, the Improvements or the Construction Contracts or Borrower fails to, at all times, provide a current address and telephone number to Lender. In the event that Borrower moves from the address set forth in the Loan Documents, Borrower immediately shall provide, by a nationally recognized overnight courier, Borrower's new address and phone number.

12.17. Failure to Timely Modify Loan to the Permanent Phase: Borrower fails to timely modify the Loan from the construction phase to the permanent phase as contemplated by the Note, the Construction Addendum to Fixed Rate or Adjustable Rate Note, this Loan Agreement and/or the other Loan Documents.

13. REMEDIES: Upon the occurrence of any Event of Default set forth in Section 12 above, in addition to any other rights and remedies, Lender may at its option and without prior demand or notice:

13.1. Termination of Lender's Obligation: Terminate Lender's obligation to make further Disbursements.

13.2. Acceleration of Note: Declare the Note immediately due and payable.

13.3. No Waivers: Notwithstanding the exercise of either or both of the remedies described in Sections 13.1 and 13.2 above, Lender may make any Disbursements after the happening of any one or more Events of Default without waiving (i) the right to demand full payment of the Note, and (ii) the right not to make any other Disbursements and shall be held harmless therefor.

13.4. Other Remedies: Proceed as authorized by law to exercise all of those rights and remedies contained in the Security Instrument and any other Loan Documents which Lender may deem appropriate, including foreclosure on the Real Property.

13.5. Possession of Real Property: Take possession of the Real Property and Improvements and perform all work and labor necessary to complete the Improvements substantially in accordance with the Plans and any change orders, in which event, such expenditures shall be deemed Disbursements under the Note and any expenditures in excess of the total amount disbursed under the Loan shall be deemed an additional advance to Borrower, payable on demand and bearing interest at the rate specified in the Note and secured by the Security Instrument. In addition, Borrower shall pay Lender a supervision fee at current market rate, but not to exceed five percent (5%) of the cost of completion of the Improvements, for supervision of construction. Such additional advance and the supervision fee shall be secured by the Security Instrument.

13.6. Lender's Right to Modify to Permanent Phase: In the event Borrower is in default because Borrower has failed to timely modify the loan from the construction phase to the permanent phase as contemplated by the Note, the Construction Addendum to Note, this Loan Agreement and/or the other Loan Documents, Lender shall have the right to provide notice to Borrower that the Loan has been modified from the construction phase to the permanent phase and the terms of the Note, Security Instrument and other Loan Documents that relate to the permanent phase are in full force and effect.

14. DISCLAIMER: WHETHER OR NOT LENDER ELECTS TO EMPLOY ANY OR ALL OF THE REMEDIES AVAILABLE TO IT IN THE EVENT OF DEFAULT, LENDER SHALL NOT BE LIABLE FOR THE CONSTRUCTION OF OR FAILURE TO CONSTRUCT OR COMPLETE OR PROTECT THE IMPROVEMENTS OR FOR PAYMENT OF ANY EXPENSE INCURRED IN CONNECTION WITH THE EXERCISE OF ANY REMEDY AVAILABLE TO LENDER OR FOR THE CONSTRUCTION OR COMPLETION OF THE IMPROVEMENTS OR FOR THE PERFORMANCE OR NONPERFORMANCE OF ANY OTHER OBLIGATION OF BORROWER.

15. GENERAL PROVISIONS:

15.1. Termination and Indemnification: Except as specifically provided herein or in the other Loan Documents, this Loan Agreement and all duties, obligations, rights and remedies contained herein shall automatically terminate upon the recordation in the public records of the county in which the Real Property is located of the Modification Agreement described in the Security Instrument. Borrower's representations, warranties, covenants, and other obligations and agreements contained in this Loan Agreement and the other Loan Documents shall survive termination of this Loan Agreement.

15.1.1 Indemnification: Borrower shall indemnify, defend, protect, and hold harmless Lender and its agents (including but not limited to Lender's inspectors) and their respective successors and assigns from and against all liabilities, losses, claims, actions, causes of action, judgments, orders, damages, costs, and expenses (including, without limitation, all consultant, expert and legal fees and expenses) directly or indirectly arising out of, or resulting from (i) Borrower's ownership of the Real Property; (ii) the construction of the Improvements on the Real Property, including, without limitation, defective workmanship or materials or noncompliance with Plans; (iii) failure to satisfy any requirements of any laws, regulations, or ordinances that pertain to the Real Property; (iv) breach of any representation or warranty made by Borrower to Lender; (v) any negligent, fraudulent, or intentional acts or omissions of Borrower, the General Contractor, any subcontractor, or any supplier to the Real Property; and (vi) any Disbursement by Lender pursuant to any Draw Request executed by Borrower and/or the General Contractor. This indemnity and hold harmless clause shall survive the Closing and any acquisition of title to the Real Property or the Improvements by Lender.

15.2. No Waiver: Any delay or omission of Lender in exercising any right or remedy arising from any default by Borrower shall not be construed as a waiver of such default or as an acquiescence, and no single or partial exercise of any right or remedy shall preclude any further exercise of Lender's rights or remedies. Lender may, at its option, waive any of the conditions in this Loan Agreement and any such waiver shall not be deemed a waiver of Lender's right nor a modification of this Loan Agreement. No waiver of any default or Event of Default shall be construed to be a waiver of, or acquiescence in or consent to, any preceding or subsequent default or Event of Default.

15.3. No Third Party Beneficiaries: Except as provided in Section 11.3.1 above, this Loan Agreement is made for the sole benefit of Borrower and Lender, their successors and assigns, and no other person or persons shall have any right or remedies under or by reason of this Loan Agreement. Lender shall not owe any duty whatsoever to any claimant (i) for labor performed or material furnished in connection with the construction of the Improvements, (ii) to apply any undisbursed portion of the Loan to the payment of any such claim, or (iii) to exercise any right or remedy of Lender under this Loan Agreement arising after any default by Borrower.

15.4. Notice: All written notices or demands required or permitted to be provided to Lender under this Loan Agreement shall be in writing and addressed to Lender as set forth below in this Section, and if to Borrower, sent to the appropriate address specified on the first page of this Loan Agreement, or to such other address as either party may designate from time to time by written notice to the other in the manner set forth in this Section. All such communications shall be deemed received (i) upon actual receipt if delivered by personal delivery, or (ii) upon the third day following deposit of the notice with the U.S. Postal Service, properly addressed with first class postage prepaid. Notices to Lender shall be provided to:

JPMorgan Chase Bank, N.A.
6465 Greenwood Plaza Boulevard, 9th Floor
Englewood, CO 80111-4905

15.5. Entire Agreement: This Loan Agreement and the other Loan Documents constitute the entire understanding between Lender and Borrower and may not be modified, amended, or terminated except by written agreement signed by both Lender and Borrower.

15.6. Documentation: In addition to the instruments and documents mentioned or referred to in this Loan Agreement, Borrower shall, at Borrower's own cost and expense, supply Lender with and sign such other instruments, documents, information and data which Lender considers, in its reasonable discretion, necessary for accomplishing the purposes of this Loan Agreement, all of which shall be in form and content acceptable to Lender. All documentation delivered to Lender by Borrower shall become the property of Lender.

15.7. Not Assignable: This Loan Agreement shall not be assigned by Borrower without the prior written consent of Lender. Subject to the foregoing restriction, this Loan Agreement shall inure to the benefit of Lender, its successors and assigns and bind Borrower, its heirs, executors, administrators, successors and assigns.

15.8. Time is of the Essence: Time is of the essence in the performance of each and every part of this Loan Agreement.

15.9. Supplement to Security Instrument and Other Loan Documents: The provisions of this Loan Agreement are not intended to supersede the provisions of the Security Instrument or any other Loan Documents but shall be construed as supplemental.

15.10. Plural and Singular: When the context and construction so require, all words used in the singular shall be deemed to have been used in the plural and all words used in the plural shall be deemed to have been used in the singular.

15.11. Lender Fees, Costs, and Expenses: Borrower shall promptly pay to Lender, without demand, attorneys fees, costs, and other expenses paid or incurred by Lender in enforcing or exercising its rights or remedies under this Loan Agreement, with interest from the date of expenditure at the interest rate specified in the Note, all of which shall be secured by the Security Instrument and any other security agreements applicable to the Loan.

15.12. Severability: Invalidation of any one or more of the provisions of this Loan Agreement by judgment or court order shall in no way affect any of the other provisions which shall remain in full force and effect.

15.13. Disclosure: Lender may reveal and distribute terms of the Loan and payment information consistent with Lender's credit reporting practices and/or whenever Lender determines that a suitable request for a credit rating has been received. Lender is not obligated and has no liability to provide Borrower with any information about the Real Property, the Improvements, or any personal property.

15.14. Signs: Lender may announce publicly and advertise its financing pursuant to the Loan including the right to erect and maintain signs on the site during the construction period.

15.15. Controlling Law: This Loan Agreement is entered into in the State and shall be controlled and interpreted by the laws of the State, except to the extent preempted by federal law.

15.16. Lender May Accept Signatures Sent by Facsimile: Borrower hereby agrees that, in order to facilitate prompt processing of documentation, Lender may accept as original signatures sent by facsimile on any documentation related to this Loan including but not limited to Draw Requests.

15.17. Course of Dealing: No course of dealing between or among any persons having any interest in this Loan Agreement will be deemed effective to modify, amend or discharge any part of this Loan Agreement, any exhibits hereto, or any rights or obligations of any person hereunder.

15.18. Enforceability: The language of all provisions of this Loan Agreement shall be construed according to its fair meaning and strictly against any party. In the event any court or other government authority shall determine any provision in this Loan Agreement is not enforceable as written, the parties agree that the provision shall be amended so that it is enforceable to the fullest extent permissible under the laws and public policies of the jurisdiction in which enforcement is sought and affords the parties the same basic rights and obligations and has the same economic effect.

15.19. Exhibit and Riders: The following exhibits and riders are attached to this Loan Agreement and incorporated into this Loan Agreement by this reference:

Exhibit A Construction Cost Breakdown or Staged Disbursement Schedule.

Rider: Interest Reserve Fund Rider, if applicable

15.20. Commitment Letter: The parties hereto agree that the terms and conditions of the commitment letter, including any applicable riders thereto, issued by the Lender to the Borrower (the "Commitment Letter") as amended, if amended, are incorporated herein and made a part hereof as if more fully set forth and the terms and conditions of the Commitment Letter shall survive the making of this Loan Agreement, and shall apply during the term hereof; and any default in the Commitment Letter shall also be deemed a default under this Loan Agreement.

15.21. Joint and Several Liability: If more than one person signs this Loan Agreement as Borrower, their obligations under this Loan Agreement are joint and several.

In Witness Whereof, Borrower and Lender have executed this Loan Agreement as of the date first set forth above.

BORROWER:

BRETT B WEINSTEIN

DANA H WEINSTEIN

ADDRESS OF BORROWER: 2623 CONDOR CIR, AUDUBON, PA 19403-

LENDER: JPMORGAN CHASE BANK, N.A.

BY:____________________________